In re MINNESOTA KICKS, INC., Debtor.

**Bankruptcy No. 4-81-2310.**

United States Bankruptcy Court, D. Minnesota.

March 19, 1985.

Allen I. Saeks, Michael A. Nekich, Leonard, Street & Deinard, Minneapolis, Minn., for petitioner.

Mark R. Miller, Keith D. Simmons, Hessian, McKasy & Soderberg, Minneapolis, Minn., for respondent.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER ALLOWING CLAIM NUMBER 121

ROBERT J. KRESSEL, Bankruptcy Judge.

This matter came on for trial on the trustee's objection to claim number 121 filed by Etablissement Oberberg. Allen I. Saeks and Michael A. Nekich appeared on behalf of Etablissement Oberberg. Mark R. Miller and Keith D. Simmons appeared on behalf of the trustee, Edward W. Bergquist.

Based on the evidence adduced at trial, the stipulation of the parties, the arguments of counsel and the entire record, I make the following:

### FINDINGS OF FACT [1]

1. Prior to 1980 Ralph Sweet, an English entrepreneur, was the vice chair, shareholder and active manager of a British professional football [2] club.

2. In early 1980 Sweet began investigating opportunities to acquire the franchise for a soccer team in the United States.

3. Sweet learned from an English solicitor, Jack Dunnett, that the Minnesota Kicks franchise was for sale. Dunnett had learned about this opportunity through Kicks' president, Freddie Goodwin.

4. Prior to October 31, 1980, Minnesota Soccer, Inc., a Minnesota corporation, owned and operated a professional soccer team known as "Minnesota Kicks".

5. Minnesota Soccer, Inc., owned and operated the "Minnesota Kicks" team as a holder of a franchise from the North American Soccer League (NASL).

6. To finance the acquisition of the Minnesota Kicks, Sweet required the participation of additional investors. In June of 1980 Sweet arranged for Arthur Wood, James Christopher Collins and himself to finance the purchase. Pursuant to their agreement the three parties would become shareholders of a corporation to be formed with contributions (30%, 30% and 40%, respectively) commensurate to their shares. The parties understood that Sweet would be active in the management of the franchise and that Wood and Collins, although officers and directors, would be passive investors.

7. Transfer of the franchise from Minnesota Soccer, Inc. to the debtor required the approval of the NASL.

8. As a condition of the transfer of a franchise the NASL required the posting of a bond or guarantee for $500,000.00 for each of the first three years the new franchisor operated the franchise. In addition the NASL required each franchise to post a $150,000.00 performance bond or letter of credit at the beginning of each season. Failure to post a bond could lead to termination of the franchise. According to the NASL constitution, performance bonds are required to "assure full satisfaction of club responsibilities."

9. In late September of 1980, in anticipation of satisfying these requirements to acquire the Kicks franchise, Sweet contact-

---

1. These Findings of Fact incorporate the facts stipulated to by the parties.

2. Football in England is the same sport that is known as soccer in the United States.

ed Dudley Sanger, the London representative of Etablissement Oberberg, a Liechtenstein investment concern with which he had had previous dealings. Sweet and Sanger discussed the NASL requirements as well as the need to secure a $700,000.00 line of credit with the Marquette National Bank for operating funds.

10. Prior to October 20, 1980, Sanger discussed the Kicks investment opportunity with his superiors. He advised Sweet of the terms on which Oberberg would provide the guarantees and Sweet verbally accepted.

11. On October 20, 1980, Sanger sent Sweet a letter confirming certain terms of their agreement and asking Sweet for a written acknowledgment of his acceptance. That letter read:

20th October 1980

Ralph Sweet, Esq.
"The Ramblers"
23 Wildhern
Nr. Andover
Hants.

_____

Dear Mr. Sweet,

### Minnesota Kicks

We confirm that for the fees hereinafter listed, we are willing to procure guarantees from the Swiss Bank Corporation in favour of Minnesota Kicks of Minneapolis, as follows:

1. To the North American Soccer League in the sum of— $650,000 (there will in fact be two separate guarantees of $500,000 and $150,000 respectively).
2. To Marquette National Bank of Minneapolis $700,000

These guarantees will remain in force until 30th September 1983.

The fees for this service will be a running fee of 1½% for the first year, payable in advance, and thereafter at the rate of 1% per annum also payable in advance, plus a final facility fee of $100,-000 to be paid at the determination of the guarantees, namely on 30th September 1983. ·

Please sign and return to me one copy of this letter, upon receipt of which I shall immediately implement this agreement. Yours sincerely,
D.B. Sanger
London Representative
Etablissment Oberberg

12. Ralph Sweet negotiated and entered into the agreement as a representative and in his capacity as an officer and director of Minnesota Kicks, Inc.

13. The facility fee of $100,000.00 set forth in the October 20, 1980 letter was a consideration for the guarantees given by the letters of credit. ·

14. Oberberg did not require the Kicks to post any collateral or security in connection with the letters of credit from the Swiss Banking Corporation (SBC).

15. The October 20, 1980 letter does not contain the complete verbal agreement the parties had previously negotiated. The parties also agreed that checks to pay the "running fees" would be made out to the Swiss Bank but mailed to Sanger at his London office. This was intended to simplify the depositing process.

16. It was agreed that Oberberg would arrange for the Swiss Bank to issue the letters of credit rather than Oberberg itself because the parties were concerned that Oberberg's credit did not have the international recognition of the Swiss Bank.

17. Without the $150,000.00 letter of credit and the $500,000.00 letter of credit issued by the SBC on October 30, 1980 to the NASL, the NASL would not have approved the transfer of the franchise to the debtor.

18. The $500,000.00 letter of credit to the NASL (No. 146034–CL) was in the form and amount specified and required by the NASL for all member teams.

19. The $500,000.00 letter of credit to the NASL (No. 146033–CL) was in the form and amount specified and required by the NASL for all franchises during the first three years after a transfer of ownership.

20. A $700,000.00 letter of credit (No. 146205–CL) was issued by the New York

branch of the Swiss Bank Corporation in favor of Marquette National Bank of Minneapolis on November 12, 1980. The Bank had specifically required that this letter of credit be issued by a bank located in the United States to avoid the complications of collecting from a foreign bank.

21. Minnesota Kicks, Inc. (debtor) was incorporated as a Minnesota corporation on October 16, 1980.

22. The debtor was established for general business purposes and was authorized to engage in any and all lawful business.

23. On October 31, 1980, the debtor entered into an agreement with Minnesota Soccer, Inc., whereby the debtor purchased certain of the assets of Minnesota Soccer, Inc. That agreement was later amended by letter agreement of November 7, 1980.

24. On November 10, 1980, a total of $1.2 million, the amount paid by the owners of Minnesota Kicks, Inc. to purchase the assets of Minnesota Soccer, Inc., was deposited in Minnesota Soccer, Inc.'s account at the Marquette National Bank (Bank). Funds from this account were subsequently paid out to the creditors and shareholders of Minnesota Soccer, Inc.

25. The assets acquired by the debtor from Minnesota Soccer, Inc., pursuant to the agreement referenced in number 23 above, consisted of the following:

| | |
|---|---|
| (A) NASL membership, franchise and marketing stock | $200,000.00 |
| (B) Player contracts | $920,000.00 |
| (C) Lease agreements | $ 5,000.00 |
| (D) Indoor soccer playing surface | $ 12,000.00 |
| (E) Other fixed assets and personal property | $ 25,000.00 |
| (F) Trademarks and intangible property | $ 18,000.00 |
| (G) Soccer novelty items | $ 20,000.00 |

No cash or receivables were acquired by the debtor (except for ticket sales for games to be played after the closing date)[3].

26. The Articles of Incorporation of the debtor named Ralph Sweet, James Christopher Collins, Arthur Wood, James Rubin and Freddie Goodwin as the first Board of Directors.

27. By an October 19, 1980 written action of the Board of Directors, Frederick Goodwin was made President; James Christopher Collins, Vice President; Michael Trucano, Secretary; and Ralph Sweet, Treasurer. In this action the Board also accepted the subscriptions of Collins and Wood as trustees for a Delaware corporation, Kicks Holding Co., which was in turn held by Sweet and several Gibraltar investment concerns of Collins and Wood. After acceptance Sweet held 40% of the available shares and Collins and Wood each held 30% pursuant to their earlier agreement.

28. The October 19, 1980 written action contains the following resolutions:

RESOLVED FURTHER, that Mr. James Christopher Collins, Vice President of the Company, is hereby authorized and directed for and on behalf of the Company to execute and deliver to MSI the purchase and sale agreement referred to above and to execute and deliver to MSI any and all documents or agreements of amendment relating to such purchase and sales agreement which he may in his sole judgment and discretion determine to be necessary or desirable, and such documents and agreements of amendment in the form of each such document or agreement of amendment as said Vice President may execute on behalf of the Company are hereby conclusively approved by the Board of Directors of the Company; and

RESOLVED FURTHER, that Mr. James Christopher Collins, Vice President of the Company, is hereby authorized and directed for and on behalf of the Company to execute and deliver to MSI and representatives, officials or agents of the North American Soccer League ("League") (i) a Form Indemnity Agreement, under which the Company and MSI

---

**3.** This is a finding to which the parties stipulated. However, it is misleading in that there appears to have been a subsequent assignment of accounts receivable from the NASL after the accounts between the old and new owners were reconciled. *See* Debtor's Ex. 10.

agree to hold harmless and indemnify the Member Clubs of the League, in such form and substance as he in his sole judgment and discretion shall deem necessary or desirable, (ii) an Agreement to act in accordance with the Constitution and Regulations of the League; (iii) a Marketing Agreement between the Company and NASL Marketing, Inc., a New York corporation, in such form and substance as he in his sole judgment and discretion shall deem to be necessary or desirable; and (iv) an acknowledgment of losses incurred by Member Clubs of the League in such form and substance as he in his sole judgment and discretion shall deem to be necessary or desirable; and that each and every document and agreement referred to herein and executed by said Vice President, and the execution thereof, is hereby expressly and conclusively approved; and

RESOLVED FURTHER, that the officers and directors of the Company, or any of them, are hereby fully authorized to execute and deliver to MSI and the League any and all such corporate documents, certificates and other papers as may be desired or required by MSI or the League, and to take such other action as may be necessary or proper in connection with any of the matters referred to in these resolutions or in order to consummate the transaction contemplated in the purchase and sale agreement referred to in the foregoing resolutions.

29. The Kicks were aware at all times after incorporation that the letters of credit required by the NASL had been issued by the Swiss Bank Corporation (SBC).

30. By checks drawn on the Kicks' account at the Bank, the following payments were made by the debtor to the SBC: (a) check no. 2337 payable to SBC dated February 17, 1981, in the amount of $18,748.89; (b) check no. 2671 payable to SBC dated March 23, 1981, in the amount of $3,300.00; and (c) check no. 3090 payable to SBC dated June 23, 1981, in the amount of $325.00.

31. Check no. 2337 was signed by Fred Goodwin, Ralph Sweet and Daryl Johnson. Check no. 2671 was signed by Daryl Johnson, Thomas Scallen and Ralph Sweet. Check no. 3090 was signed by Ralph Sweet and Thomas Scallen. All of these checks were executed by persons with power to sign checks drawn on the debtor's account.

32. The Kicks were aware, at all times after incorporation, that a letter of credit from SBC secured its obligation to the Bank under the $700,000.00 line of credit.

33. All proceeds from loans obtained by the Kicks from the Bank and secured by the letter of credit (no. 146205–CL) were paid into the corporate bank account of the debtor.

34. The $700,000.00 line of credit obtained from the Bank was based on Freddie Goodwin's projected first year losses for the Kicks. The actual losses were substantially greater. Ralph Sweet contributed some $386,000.00 in addition to his initial investment to keep the club operating. Sweet also gave his personal guarantee to the Marquette National Bank on several occasions to obtain advances to make payroll. Advances of $50,000.00 each to the debtor were obtained from the Bank on June 15, 1981, August 3, 1981 and September 10, 1981. Each such advance was guaranteed personally by Ralph Sweet.

35. On October 16, 1981, after Sweet had learned that Collins and Wood were no longer willing to continue supporting the Kicks and in light of the continuing cash shortage, Sweet advised the management of the Kicks and the NASL that no additional funds would be forthcoming and that he intended to liquidate the business if it could not be sold or its operation taken over by the NASL immediately.

36. On October 21, 1981, the Bank made a demand on the Kicks for the unpaid balance of their note and accrued interest on the amount of $733,382.64. On October 22, 1981, the bank made a demand on the Swiss Bank to pay on the letter of credit (No. 146205–CL). The Swiss Bank remitted $700,000.00 to the Bank on October 28, 1981.

37. On November 12, 1981, Minnesota Kicks, Inc., filed a voluntary bankruptcy petition under 11 U.S.C. Chapter 7.

38. The debtor did not pay certain of its debts to the Bank and did not perform certain of its obligations to NASL. As a result, NASL claimed to have a right to draw against its letters of credit (Nos. 146033–CL and 146034–CL).

39. By agreement of the Trustee and the NASL and by order of the Bankruptcy Court, the NASL made claims totaling $650,000.00 against the letters of credit (Nos. 146033–CL and 146034–CL). SBC paid $650,000.00 on the letters of credit.

40. SBC paid a total of $650,000.00 in drafts to the NASL ($95,000.00 on November 27, 1981; $405,000.00 on December 28, 1981; and $150,000.00 on December 28, 1981) and $700,000.00 to the Bank (on October 28, 1981) against the letters of credit.

41. The bankruptcy estate received $266,000.00 plus interest from proceeds of the letters of credit to the NASL.

42. The bankruptcy estate received $143,021.00 plus interest from the sale of player contracts preserved with proceeds of the letters of credit to the NASL.

43. The bankruptcy estate received $114,088.00 plus interest not attributable, either directly or indirectly, to any proceeds of any of the letters of credit.

44. Upon liquidation of the assets of the debtor, the Trustee received the following amounts for the sale of these respective assets:

| Player Contracts | | |
|---|---|---|
| Tim Twellman | $10,000.00 | |
| David Stride | $15,000.00 | |
| Tino Lettieri | $15,000.00 | |
| Ron Futcher | $45,000.00 | |
| Ace Ntsolengoe | $ 58,021.00 | |
| | $143,021.00 | $143,021.00 |
| Other Assets Sold | | |
| Office furniture | $ 5,000.00 | |
| T-shirts | $ 3,800.00 | |
| Artificial turf | $ 450.00 | |
| Video recorder | $ 700.00 | |
| Clothing | $ 550.00 | |
| Automobile | $ 3,900.00 | |
| Video tapes | $ 150.00 | |
| Artificial turf | $ 7,000.00 | |
| Tickometer | $ 1,528.00 | |
| Hydroculator | $ 800.00 | |
| Logo | $ 50.00 | |
| Megaphones | $ 70.00 | |
| | $24,078.00 | $24,028.00 |
| | | $167,049.00 |

45. Oberberg never sent any written notice to the debtor in which Oberberg expressly claimed a right of subrogation.

46. Oberberg has not commenced an action against Sweet or any other persons seeking relief of any nature under the October 20, 1980 letter agreement.

47. The debtor's registered office and principal place of business have, at all times, been located in the County of Hennepin, State of Minnesota.

48. Etablissment Oberberg (Oberberg) is a Liechtenstein business and maintains a place of business in London, England.

49. Ralph Sweet, at all relevant times, has been a citizen and resident of the United Kingdom.

50. Sweet was one of several owners or beneficial owners of the debtor.

51. Fred Goodwin, as President of the debtor, had authority under the Bylaws to execute and deliver, in the name of the corporation, contracts and other instruments pertaining to the business of the corporation.

## CONCLUSIONS OF LAW

The trustee has objected to Oberberg's claim for $1,350,000.00 for "cash payments made under guarantees provided on behalf of Minnesota Kicks, Inc." *See* claim 121 filed May 24, 1982. As a general rule, a claim which is filed is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a) (1983). If a party in interest, such as the trustee, objects to a claim, § 502(b) provides, in pertinent parts,

> the court, after notice and a hearing, shall determine the amount of such claim as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that—
>
> (1) such claim is unenforceable against the debtor, and unenforceable against

property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured ...

11 U.S.C. § 502(b) (1983).

The trustee in this case asserts that Oberberg's claim is not allowable because the "debtor is not indebted to the claimant." *See* Trustee's objection to claim filed January 26, 1983. The trustee asserts that the letter agreement of October 20, 1980, on which Oberberg bases its claim is in fact a personal agreement between Oberberg and Ralph Sweet, one of the principals of the debtor, and was never authorized nor ratified by the debtor. The trustee argues that the letters of credit issued pursuant to that agreement were intended to obtain funds to permit the acquisition of the Kicks' franchise and to capitalize the debtor. The trustee further argues that the claimant does not succeed to the rights of the creditors who were paid with the proceeds of the letters of credit which Oberberg funded. Alternatively, the trustee argues that if Oberberg's claim is allowable, it should be subordinated to the claims of "true creditors" pursuant to 11 U.S.C. § 510(c) under a theory of equitable subordination.

I am not persuaded by the trustee's arguments and conclude that Oberberg has a claim in the amount of $1,350,000.00. This conclusion is based on my determination that the letter agreement on which Oberberg bases its claim was an agreement between Oberberg and Ralph Sweet as an agent of the debtor and subsequently adopted by the debtor; thus the true issue is whether the agreement gives Oberberg the right to reimbursement for funds it paid out under the letter of credit Oberberg arranged to be issued by the Swiss Bank Corporation. I believe the conclusion that Oberberg has a claim is concurrently or alternatively reached by my determination that Oberberg acquired the rights of subrogation to the claims of creditors of the debtor who were paid with the proceeds of the letters of credit Oberberg funded.

The threshold issue in reaching my decision in this case was a determination of what law should be applied. Although neither of the parties share my concern for this issue, I believe the variety of potential jurisdictions involved makes the choice of applicable law an essential issue which must be resolved to insure the appropriate outcome.

## CHOICE OF LAW

I see this issue arising because of the diversity of domiciles and citizenships of the parties and the numerous and varying forums in which the conduct and performance relevant to this case occurred. For example, the letter agreement on which Oberberg bases its claim is signed by Ralph Sweet and Dudley Sanger, both citizens of the United Kingdom. The agreement was executed in England. It involves Oberberg which is a partnership organized in Liechtenstein with contacts in Switzerland and doing business in the United Kingdom. It also involves the Swiss Bank which issued the letters of credit provided for in the agreement. The Swiss Bank's offices in both Switzerland and New York were involved. The Minnesota Kicks, which was a party to the agreement and on whose behalf letters of credit were issued, is a Minnesota corporation with the principal place of business in Minnesota and contacts via its shareholders in Delaware, the United Kingdom and Gibraltar. The possible multiple combinations and permutations available from this non-exclusive list of possible forums make it clear that it is necessary to clarify what forum's law is to be applied before the issues raised by the trustee's objections may be addressed.

## CONFLICTS

Given the possible number of forums whose laws could be applied in this case, I do not think it is as obvious as the trustee asserts that Minnesota law applied.[4] Nor was I particularly pursuaded

4. The trustee argues that Fed.R.Civ.P. 44.1 re-    quires notice where a party intends to raise an

by Oberberg's argument that the mere fortuity that the letter agreement was executed in England requires that English law be applied.[5] Nevertheless, after venturing into the quagmire of case law and commentary on the criteria to be used in choosing the appropriate forum whose law should be applied in contract cases, I have concluded that Minnesota law should be applied in determining both the contract and subrogation issues.

■ It is generally accepted that the traditional rule *lex loci contractus*, that the place of "making" controls the choice of law applicable to a contract, as well as the sometimes applied *lex loci solutionis*, or law of the place of performance rule, may be modified by the express or implied intentions of the parties. *Gaston, Williams & Wigmore v. Warner*, 260 U.S. 201, 43 S.Ct. 18, 67 L.Ed. 210 (1922); *Pinney v. Nelson*, 183 U.S. 144, 22 S.Ct. 52, 46 L.Ed. 125 (1901); *Coghlan v. South Carolina R. Co.*, 142 U.S. 101, 12 S.Ct. 150, 35 L.Ed. 91 (1891); *Pritchard v. Norton*, 16 Otto 124, 106 U.S. 124, 1 S.Ct. 102, 27 L.Ed. 104 (1882); *O'Toole v. Meysenburg*, 251 Fed. 191 (8th Cir.1918), *cert. denied* 248 U.S. 583, 39 S.Ct. 136, 63 L.Ed. 432 (1919); *Green v. Northwestern Trust Co.*, 128 Minn. 30, 150 N.W. 229 (1914). *See also* 16 Am.Jur.2d *Conflicts of Law*, 2d § 82 (1979). "The intention of the parties as to which law shall govern their contract is, ordinarily, decisive; the [traditional] conflict of laws rules in this regard being for the most part presumptions employed where a clear expression of intention is lacking." *Travelers Ins. Co. v. American Fidelity & Casualty Co.*, 164 F.Supp. 393 (D.Minn.1958). The intention of the parties may be found in the nature of the transac-

tion, the subject matter of the contract and circumstances. Intention will prevail, however, only when the selected forum has a vital connection with the transaction and where the purpose in making the choice is for a purpose other than to commit a fraud on the law. *Green v. Northwestern Trust Co.*, 128 Minn. 30, 150 N.W. 229 (1914).

The fact that the choice of law issue was raised *sua sponte* rather than by the parties evinces a strong intention on their part that the law of this forum be applied. It seems no more than mere fortuity that there are so many contacts with other forums involved here. Finally, the debtor's principal place of business was Minnesota and the majority of the significant events occurred here. Collectively I believe these events and circumstances indicate that the parties intended that Minnesota law apply to their transactions. Because this choice appears to be for reasons other than committing a fraud on the law, this intention will prevail and the case decided accordingly.[6]

## LETTER AGREEMENT

Oberberg primarily bases its claim on the October 20, 1980 letter signed by D.B. Sanger as the London representative of Etablissement Oberberg and Ralph Sweet. The trustee argues that this letter does not create a valid enforceable agreement against the debtor. The trustee first argues that the agreement is between Oberberg and Sweet personally. Alternatively the trustee argues that even if the debtor was a party to the agreement, the agreement only addresses the issuance of the letters and neither expressly nor implicitly creates an obligation to reimburse Ober-

---

issue concerning the law of a foreign country. I do not think this precludes me from raising the question nor does it relieve me of my responsibility to apply the appropriate law in deciding a case.

5. In any case, neither party supplied me with more than unsubstantiated opinions via affidavit or letter as a basis for determining what the applicable English law might be.

6. This conclusion also comports with the modern choice of law rule which is evolving. Rather than applying the mechanical traditional rule and instead of regarding as conclusive the intentions of the parties, many courts apply the law of the forum with the most significant relation, connection or contacts with the matter in dispute. *See* Restatement (Second) Conflict of Laws, § 188 (1971). As stated in the text of this opinion, this forum has most significant contact with the matters in dispute in this case.

berg in the event that the letters of credit were drawn down upon. The trustee argues that therefore no debt now exists on which Oberberg can base a claim.

I am not persuaded by these arguments. I believe Ralph Sweet negotiated and signed the agreement on behalf of the debtor in his representative capacity as an officer and director of the debtor. Further, even if entering into the agreement was beyond the scope of his authority at the time of the agreement as the trustee alleges, it was subsequently adopted by the debtor so that the debtor became a party to the agreement. Second, while the agreement is silent on the issue of reimbursement, evidence was presented that the parties intended that Oberberg would be reimbursed if it had to pay on the letters of credit. Alternatively, Oberberg has a claim as subrogee to the creditors' claims who were paid the proceeds of the letters of credit.

## PARTIES TO THE LETTER AGREEMENT

■ The written action of the Board dated October 19, 1980, contains a resolution that "the officers and directors of the company, or any of them, are hereby fully authorized to execute and deliver to MSI and the League any and all such corporate documents, certificates and other papers as may be desired or required by MSI or the League, and to take such other action as may be necessary or proper in connection with any of the matters referred to in these resolutions or in order to consummate the transaction contemplated in the purchase and sales agreement referred to in the foregoing resolution." (Debtor's Ex. 4/Claimant Ex. D).

The other proposed principals of the corporation were passive investors who were relying totally on Sweet as managing partner or managing director and intended that he do whatever was necessary, regardless of the corporate formalities. Admittedly, the verbal agreement antedated the actual incorporation of the debtor. However it was one of many steps required and clearly done on behalf of the new entity known as the Kicks and confirmed in writing after the debtor's incorporation and the October 19, 1980 resolution.

■ In addition, even if the debtor was not a party to the agreement initially, I think Oberberg correctly argues that the debtor adopted the agreement contained in the letter and thus the agreement was binding on the debtor. While a corporation is not necessarily bound by the engagements made on its behalf by its promoters before a corporation is organized, it may after its organization make such engagements it contracts by adopting them. It is not a requisite that such adoption or acceptance be express, but it may be shown from acts or the acquiescence of the corporation or its authorized agent. *Battelle v. Northwestern Cement and Concrete Pavement Company,* 37 Minn. 89, 33 N.W. 327 (1887). *See also Boyce v. Chemical Plastics, Inc.,* 175 F.2d 839 (8th Cir.), *cert. denied,* 338 U.S. 828, 70 S.Ct. 77, 94 L.Ed. 503 (1949); *National Cash Register Co. v. Ness,* 204 Minn. 148, 282 N.W. 827 (1938); *Bond v. Pike,* 101 Minn. 127, 111 N.W. 916 (1907). After receiving the benefit of the previous engagement and accepting and using the property in its business and knowing that the corporation was to pay for the benefit, the corporation can hardly be permitted now to deny liability. *Bond v. Pike,* 101 Minn. 127, 111 N.W. 916 (1907); *Battelle v. Northwestern Cement and Concrete Pavement Company,* 37 Minn. 89, 33 N.W. 327 (1887).

■ If a corporate officer or agent enters into a contract or other transaction without authorization but which could have been authorized, such contract or transaction may become binding on the corporation if ratified expressly or by implication. 2 Fletcher Cyclopedia, Corporations, (Perm. ed.), § 752 (1982). The general rule is that ratification must be by the principal with knowledge of the material facts of the transaction although if the circumstances are such as to put a reasonable person on inquiry the corporation is considered to have knowledge of any facts such an in-

quiry would disclose. *Losinski v. American Dry Cleaning Co.,* 281 N.W.2d 884, 887 (Minn.1979) *citing Keough v. St. Paul Milk Co.,* 205 Minn. 96, 285 N.W. 809 (1939); *Thompson v. Northstar Muskrat Farm, Inc.,* 183 Minn. 314, 236 N.W. 461 (1931).

In this case the corporation by its actions or acquiescence to acts of its agents adopted the contract made by Sweet with Oberberg. Officers and directors, as well as the active management of the debtor, were aware of the posting of certain letters of credit as a prerequisite to the transfer of the franchise from Minnesota Soccer, Inc. to Minnesota Kicks, Inc. Although the officers and management were not aware of the identity of the party providing the requisite letters of credit nor the exact terms of the agreement by which they were provided, they were aware of the existence of the required letters, signed checks to pay the annual "running fees" required and accepted the benefit of them, thus implicitly adopting the agreement as one binding on the corporation.

### RIGHT TO REIMBURSEMENT

██ The agreement between Oberberg and the debtor is silent on the issue of reimbursement. The trustee argues that Oberberg is not entitled to reimbursement and therefore has no claim against the estate. While it is not the role of the Court to impose obligations where none are intended by the parties or required by law, in this instance I believe the parties intended that Oberberg would have a claim against the debtor if Oberberg had to pay on the letters of credit it provided. In addition, the term "guarantee" as used in the letter agreement is a technical term usually understood by persons in the investment business to include an obligation to repay any monies actually paid out. Therefore in either case I believe Oberberg has an allowable claim against the debtor.

██ The parol evidence rule, which generally precludes the introduction of extrinsic evidence to demonstrate the intention of the parties to a non-ambiguous integration of agreement, does not apply to writings of an informal nature constituting mere memoranda of the agreements themselves. 30 Am.Jur.2d *Evidence* § 1024 (1967). Where it is apparent that the written agreement is not a complete and final statement of the whole transaction between the parties, parol evidence is admissible, not to vary the terms of the written instrument but to explain the intentions of the parties and language that is ambiguous. *Material Movers, Inc. v. Hill,* 316 N.W.2d 13 (Minn.1982); *Flynn v. Sawyer,* 272 N.W.2d 904 (Minn.1978); *Weyerhaeuser Co. v. Hvidsten,* 268 Minn. 448, 129 N.W.2d 772 (1964). *See also* 7A Dunnell *Evidence* §§ 3392 & 3406 (1974); 30 Am. Jur.2d *Evidence* § 1044 (1967). Where a word or phrase is used in a particular sense applicable to a particular trade or business, it is proper to receive extrinsic evidence to explain or illustrate the meaning of that word or phrase. *Maurin v. Lyon,* 69 Minn. 257, 72 N.W. 72 (1897); 30 Am.Jur.2d *Evidence* § 1075 (1967).

In this case the October 20, 1980 letter agreement merely confirms certain terms of an earlier oral agreement. It neither purports nor appears to be the entire agreement between the parties. Both Sanger and Sweet understood that Oberberg would have a claim against the debtor in the event that Oberberg had to pay on the letters of credit.

Further, "guarantee" as it was used in the letter agreement is the English term for a standby letter of credit. As such, when the word "guarantee" is used, the parties understand that in addition to certain agreed fees to be paid to compensate for the opportunity costs of putting $1.3 million at risk, the investing party would have recourse against the account party for any funds paid out. The investor acquires "cession rights" which are subrogation rights which will be discussed in the next section.

I do not think as the trustee suggests that the silence of the written memoranda of the parties precludes Oberberg's claim. On the contrary it is not surprising that the

issue was not addressed, because parties generally do not expect that standby letters of credit will be drawn on. Arnold & Bransilver, *Standby Letters of Credit: The Controversy Continues,* 10 U.C.C.L.J. 272, 279 (1977). *See also* Wheble, *Problem Children—Standby Letters of Credit and Simple First Demand Guarantees,* 24 Ariz.L.Rev. 301, 302 (1981). In this instance I find the description of the parties' intentions and understanding more credible than that which the trustee urges, and therefore find that the agreement includes an obligation of the debtor to reimburse Oberberg on which Oberberg can now base its claim.

## SUBROGATION

▇ Whether described as cession[7] or subrogation rights, Oberberg argues that when it paid on a standby letter of credit it acquired and may assert the claim of any creditor paid with the proceeds. In other words the payor "stands in the shoes" of the creditor for the purpose of asserting the claim against the debtor. This seems logical; however getting from point A to B in this case is made more difficult because of the nebulous nature of standby letters of credit, the equitable nature of subrogation, the existence of Swiss Bank Corporation and its New York branch as intervening parties and the nature of the obligations to Marquette National Bank and NASL. Despite these complicating factors, I believe Oberberg is correct that they are entitled to assert a claim they acquired by subrogation in the amount they paid on the letters of credit.

Standby letters of credit, as distinguished from the more traditional sales letters of credit, have become increasingly popular and are now being used in lieu of otherwise applicable financial tools such as contracts for suretyship or guarantees. Standby letters of credit, unlike sales letters, are not devices used to finance or pay for goods. Rather, standby letters of credit represent the obligation of the issuer to pay not in the ordinary course but in the event the customer defaults. Although clearly certain obligations, such as the manner of demand, payment and timing of both sales and standby letters of credit are prescribed by the Uniform Commercial Code, the similarities of the standby letter of credit and guarantees or suretyship has given rise to significant commentary and some case law attributing standby letters of credit with additional attributes. Specifically, commentators suggest issuers of standby letters of credit should be granted rights of equitable subrogation in a manner similar to that now employed by guarantors and sureties. Jarvis, *Standby Letters of Credit—Issuers, Subrogation and Assignment Rights—Part I,* 9 U.C.C.L.J. 356 (1976). *See also* Jarvis, *Standby Letters of Credit—Issuers, Subrogation and Assignment Rights—Part II,* 10 U.C.C.L.J. 38 (1977); Arnold & Bransilver, *Standby Letter of Credit—The Controversy Continues,* 10 U.C.C.L.J. 272 (1977); Wheble, *Problem Children—Standby Letters of Credit and Simple First Demand Guarantees,* 24 Ariz.L.Rev. 301 (1982).

I think the commentators persuasively point out that the function of standby letters of credit can be equally well served by the simple demand guarantee.[8] This is particularly true in the case of standby letters of credit as opposed to sales letters of credit where they are generally drawn on when payment is not otherwise made in a separate underlying transaction. Wheble, *Problem Children—Standby Letters of Credit and Simple First Demand Guarantees,* 24 Ariz.L.Rev. 302 (1982). While a letter of credit may require conformity with certain obligations and formalities which are not required of a guarantee, where there is no contrary policy reason for treating them dissimilarly for other purposes, precluding the assertion of subrogation rights to issuers of standby let-

---

7. Apparently the English word to describe subrogation.

8. Unfortunately, most banks, in the United States at least, are not allowed to issue guarantees. *See* 12 C.F.R. § 7.7000 *et. seq.* (1983). *See also* Minn.Stat. § 48.20 (1927).

ters of credit while allowing guarantors to assert them would be no more than an exercise in honoring form over substance. Ellinger, *Standby Letters of Credit*, 6 Int'l. Bus.L. 604, 612–14 (1978).

Subrogation entitles the surety or guarantor to use any remedy against the principal which the creditor could use and in general to enjoy the benefit of any advantage that the creditor had. I think it is clear that the surety or guarantor can assert a claim against the estate of the debtor for debts it was required to pay. *See Dannerbeck v. Palmer*, 502 F.2d 686 (9th Cir.) *cert. denied*, 419 U.S. 1050, 95 S.Ct. 626, 42 L.Ed.2d 645 (1974). Therefore I think the issuer of a letter of credit can also assert the claim of creditors paid with proceeds of the letter of credit.

In this case the question then becomes does Oberberg, who is actually the customer causing the letters of credit to be issued and with an obligation to pay the Swiss Bank Corporation, the issuer, acquire the rights the issuer acquired by paying on the letters of credit. I think this question can be resolved by applying the more traditional principles of subrogation.

Subrogation is an equitable right and therefore subject to equitable principles. Generally subrogation is a right acquired when one, pursuant to an obligation and not as a volunteer, fulfills the duties of another and thus becomes entitled to assert the rights of that other against third persons. *New York Casualty Co. v. Sazenski*, 240 Minn. 202, 60 N.W.2d 368 (1953). *See also Fidelity & Casualty Co. v. Dykstra*, 208 F.Supp. 717 (D.Minn.1962); *Bursell v. Morgan*, 181 Minn. 462, 233 N.W. 12 (1930); *Felton v. Bissel*, 25 Minn. 15 (1878). Subrogation rests on the principle that one who has been compelled to pay a debt which ought to have been paid by another is entitled to succeed to all the remedies which the creditor possessed against the other.

Oberberg is clearly not a volunteer. The letter of credit Oberberg has issued in favor of the debtor imposes an obligation to reimburse Swiss Bank Corporation as an issuer for any funds paid. Minn.Stat. 336.-5–114(3) (1983). It seems clear, therefore, that for the reasons similar to those discussed with regard to subrogation of Swiss Bank Corporation as issuer, where Oberberg paid Swiss Bank Corporation for the debtor's debts pursuant to the contract between Swiss Bank and Oberberg, Oberberg should acquire whatever rights Swiss Bank acquired when it paid the debtor's creditors.[9] Therefore to the extent Marquette National Bank and NASL could assert claims against the debtor, I believe Oberberg may now assert them.

Once I have determined that Oberberg is subrogated to the rights of NASL and Marquette National Bank, the issue becomes what claims the Marquette National Bank and NASL could have asserted. With regard to the bank, I think it is clear that the debtor owed Marquette for the money it received on its line of credit established to provide operating funds for the debtor. Clearly but for the letters of credit Marquette would have asserted a claim against the debtor for money it lent; therefore Oberberg can now assert that claim to the extent of $700,000.00 it paid on the letter of credit in favor of the Marquette National Bank.

The claim Oberberg acquired from NASL is somewhat different. At the beginning of each season the NASL requires that each of its franchisees post a $150,000.00 letter of credit, the stated purpose of which is to protect the NASL against losses it might incur if the team failed to complete that season (1) if the debtor fails to perform fully as an operating member club of the NASL or (2) the debtor failed to discharge any lawful obligation to the NASL or another member team.

The second $500,000.00 letter of credit is required by the NASL for each of the first

---

**9.** Furthermore, it seems extremely inequitable to preclude Oberberg's subrogation because Swiss Bank was the issuer where this structure was solely a preference of international recognition of SBC.

three years following a franchise transfer. The stated purpose of this letter of credit was to provide a fund for payment of a franchisee's business creditors in the event that the underfunded franchise failed during the first three years and thereby protecting the reputation of professional soccer and the NASL. The $500,000.00 letter of credit could be drawn down on the occurrence of one of five conditions: (1) the debtor failed to file the $150,000.00 letter of credit at the beginning of the season; or (2) the debtor became unable to play its home games; or (3) the debtor disbanded its team; or (4) the debtor failed to field the team at a scheduled NASL game; or (5) the NASL took over operation of the debtor's team and incurred losses.

The trustee argues that unless and until Oberberg can demonstrate that actual creditors of the debtor were paid with the proceeds of the letters of credit in favor of the NASL that there are no creditors whose claims to which Oberberg can be subrogated. I disagree. Requiring letters of credit as a condition of transferring or continuing the franchise is essentially a liquidated damages provision to be effective in the event of a default. Following the trustee's reasoning would allow debtors to circumvent the intended purpose of providing for liquidated damages. That clause represents an amount of damage agreed on by the parties in the event of breach and is designed to prevent litigation to establish the specific damages. I think the NASL would have had a claim against the estate for the amount of those agreed damages and for the reasons discussed above, I believe Oberberg is now subrogated to those rights and may assert them against the estate. Oberberg therefore also has a claim against the estate in the amount of the letters of credit in favor of the NASL or $650,000.00.

## SUBORDINATION

█ Finally the trustee argues that, if Oberberg is determined to have a claim against the debtor, its claim should be subordinated pursuant to 11 U.S.C. § 510(c).

Section 510(c) allows the Court to "under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim...." It is somewhat difficult to understand how the trustee's arguments relate to § 510(c) and in any event the trustee failed to meet his burden on this issue.

In this district a two-pronged test has been adopted for determining whether equitable subordination should be imposed. In *F & M Marquette Bank of Minneapolis v. Investment Sales Diversified, Inc. (In re Investment Sales Diversified )*, CIV 3-84-18, F.Supp. (D.Minn. Sept. 13, 1984), the District Court adopted the pre-Code standard for equitable subordination stating, "[B]efore imposing equitable subordination, a court must explicitly find that (1) a claimant has engaged in some type of inequitable conduct and (2) that the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant." *Id.* at 4 *citing Wilson v. Huffman (In the Matter of Missionary Baptist Foundation of America, Inc.,* 712 F.2d 206, 212 (5th Cir.1983).

█ The burden of proof for establishing the inequitable conduct for the purposes of the first prong of the test depends on whether the claimant is an insider of the debtor. "When the claimant is an insider, the bankruptcy trustee must prove that the claimant breached a fiduciary duty." *In the Matter of W.T. Grant,* 4 B.R. 53, 74 (Bktcy.S.D.N.Y.1980). Where a claimant is a non-insider, however, the standard of misconduct is very substantial and requires a showing of gross misconduct. *Id.* at 74–75; *Anaconda-Ericsson, Inc. v. Hessen, (In the Matter of Teletronics Services, Inc.,* 29 B.R. 138, 169 (Bkrtcy.E.D.N.Y.1983). *See F & M Marquette Bank of Minneapolis v. Investment Sales Diversified, Inc. (In re Investment Sales Diversified),* CIV 3–84–18, (D.Minn. Sept. 13, 1984).

In this case it is unnecessary to determine the status of the various parties as

insiders because none of the evidence submitted supports any assertion that there was any inequitable conduct by the debtor, the principals of the debtor, the NASL, Marquette National Bank, Oberberg or the Swiss Bank Corporation.

The trustee makes two additional arguments under the guise of equitable subordination. Both these arguments are something else altogether and in any case neither provide grounds for subordination under § 510(c) nor are supported by the facts.

First the trustee argues in a manner similar to his arguments against subrogation that the obligation to Oberberg is an individual obligation of Ralph Sweet and Oberberg has received the benefit of its bargain, having received its running fees, and is entitled to no more. These arguments are no more persuasive for this purpose than they were above.

The trustee then argues that Oberberg provided funds to protect creditors whose claims arose in the operation of business and thus should not be allowed to compete with those creditors for the funds provided. This argument seems to be related to an assertion that the letters of credit are in the nature of a capital contribution, that the debtor was undercapitalized so that Oberberg may have an interest, but not a claim, which is subordinated to the claims of general creditors. Unlike the cases cited, Oberberg was never a shareholder of the debtor and there is no evidence of an intent that the proceeds be capital infusion.

No evidence was offered at trial that the debtor was thinly capitalized. In fact the only witness who testified on that subject stated that the contrary was true. Michael Trucano, the secretary of the debtor and an experienced corporate and tax attorney, testified that he would be "comfortable with even a 3 (debt) to 1 (equity) ratio." In this case a ratio of $1,586,000.00 equity (all cash) to $750,000.00 debt was more than a 2 to 1 equity to debt ratio. Under this analysis, even the original cash equity of $1,200,000.00 would satisfy the 3 to 1 debt-equity ratio and would similarly reverse the debt-equity ratio for the purposes of determining whether the debtor was thinly or highly capitalized. At most, the trustee offered evidence that at the time the debtor went out of business it had insufficient funds to continue its operation; however it is the initial capitalization which is relevant in determining whether the corporation is thinly capitalized. Therefore there appears to be no factual basis for the trustee's argument that Oberberg's claim should be treated as a capital contribution subject to subordination to the claims of general creditors.

## ORDER

For the reasons discussed above,

IT IS ORDERED, the trustee's objection is overruled and claim # 121 file of Etablissment Oberberg is allowed in the amount of $1,350,000.00.