In re Vernon G. TAGGATZ, Debtor.

Don E. WHINNERY, Plaintiff,

v.

BANK OF ONALASKA, Defendant.

Bankruptcy No. WU7–86–00169.
Adv. No. 88–0082–7.

United States Bankruptcy Court,
W.D. Wisconsin.

Sept. 29, 1989.

Jeffrey W. Guettinger, Eau Claire, Wis., for plaintiff.

Konrad T. Tuchscherer, Wausau, Wis., for defendant.

## MEMORANDUM OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

THOMAS S. UTSCHIG, Bankruptcy Judge.

### PROCEDURAL POSTURE

The trustee, Don Whinnery, by his attorney Jeffrey W. Guettinger, filed a complaint against the Bank of Onalaska (the Bank) for failure to turnover property of the estate pursuant to 11 U.S.C. § 542(b) and (c). Trial was held on March 2 and March 3, 1989. The Bank appeared by its attorney Konrad T. Tuchscherer.

### ISSUE

■ The question presented by this case is twofold: 1) whether an agreement between the debtor and the Bank to fund the unfunded portion of a promissory note upon fulfillment of conditions precedent constitutes an executory contract under 11 U.S.C. § 365; 2) whether such an agreement between the debtor and the Bank constitutes a contract to make a loan, or extend other debt financing or financial accommodations under 11 U.S.C. § 365(c)(2). For the reasons stated below, the Court holds that the agreement between the parties to fund the unfunded portion of the promissory note upon fulfillment of conditions precedent constitutes an executory contract under 11 U.S.C. § 365, and that this agreement also constitutes a contract to make a loan or extend other debt financing or financial accommodations under 11 U.S.C. § 365(c)(2). Accordingly, the trustee may not assume the agreement between the debtor and the Bank.

### STATUTES

The question before the Court involves 11 U.S.C. § 365(c) which reads in part:

(c) The Trustee may not assume or assign an executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties if—

\*    \*    \*    \*    \*    \*

(2) such contract is a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, or to issue a security of the debtor;

### FACTS

In the Winter of 1985 the debtor Vernon Taggatz, the owner of an insurance agency, was looking for real estate and financial credit. At the same time Charles Raymond, the owner of a parcel of real estate and the president of the Bank of Onalaska, was looking for customers. The two men met in Florida in the early Spring of 1985 to discuss their mutual interests. Mr. Raymond encouraged the debtor to make him an offer on the real estate and to contact his bank for financial services.

In the Spring of 1985 the debtor visited the Bank of Onalaska several times to meet with Dan Netwal, executive vice president of the Bank of Onalaska. During those meetings the two men loosely discussed the financial needs of the debtor and the lending requirements of the Bank. The debtor wanted a master loan, a $400,000 line of credit, and a short-term loan; the Bank wanted a profit and loss statement, an appraisal of the insurance agency, a copy of the debtor's tax returns, a cash flow statement and either a purchase or lease of real property within the Bank's lending area. Neither the debtor's financial needs nor the Bank's lending requirements were ever memorialized in writing.

On March 29, 1985, the debtor executed a 45–day promissory note in the amount of $50,000. Mr. Netwal issued a bank money order drawn on the Bank of Onalaska in the amount of $50,000. The note was unsecured but the debtor was required to submit a sworn financial statement which estimated the debtor's net worth to be $3,981,-500.

On April 25, 1985, the debtor sent a letter to Mr. Netwal which stated his insurance commissions for the past three years and enclosed a letter from Becker, Kumm and Associates, the debtor's accounting firm, which offered to supply the Bank with any information concerning the Taggatz Agency.

On May 13, 1985, the debtor executed a 60–day promissory note in the amount of $75,000. Mr. Netwal issued a bank money order drawn on the Bank of Onalaska in the amount of $75,000. The debtor paid the $50,000 note in full with a check and promised to pay the $75,000 note within 10 days instead of 60 days. The note was unsecured.

On May 22, 1985, Jane L. Gucwa, second vice president with the All American Life Insurance Company, wrote a letter to Mr. Netwal which he received. The letter read:

Dear Mr. Netwal:

Mr. Taggatz has already generated in the excess of $150,000 of New Annualized Premium in 1985.

The new business will pay in excess of $100,000 of commission and additional commission earned in the form of Bonuses.

Further, there is a continual flow of Business currently in route to the Company.

On Tuesday, June 11, 1985, the debtor met with Mr. Netwal at the Bank of Onalaska. Mr. Netwal suggested that the debtor improve his financial position by paying the $75,000 note with the Bank of Onalaska. The debtor paid the $75,000 note with a check drawn on the Nekoosa Port Edwards State Bank. The debtor suggested that Mr. Netwal write a letter to the M & I Peoples Bank of Coloma stating the status of their negotiations. Mr. Netwal wrote a letter to Richard Lysy, president of the M & I Peoples Bank of Coloma which read:

Dear Mr. Lysy:

Mr. Vern Taggatz has applied to the Bank of Onalaska for a line of credit up to a maximum of $400,000.00.

Mr. Taggatz has made a proposal to purchase commercial and investment real estate in our area. The Bank of Onalaska Loan Committee meets on June 13, 1985, for a review of this proposal. With the information received to date regarding Mr. Taggatz, I anticipate a favorable response to this credit request.

If you need any additional information, please contact me anytime.

On Friday, June 14, 1985, the Bank of Onalaska presented for payment the $75,000 check drawn on the debtor's account with the Nekoosa Port Edwards State Bank. Because the debtor was overdrawn at that time, Betty Rowe, manager of operations for the Nekoosa Port Edwards State Bank, showed the check to Mr. Sigler, president of the Nekoosa Port Edwards State Bank. Mr. Sigler held the check and contacted the debtor.

On the evening of June 14, 1985, the debtor delivered an appraisal of his insurance agency to Mr. Netwal. While he was waiting for Mr. Netwal, the debtor opened a checking account and received some counter checks without making a deposit. During his meeting with Mr. Netwal, the debtor said he needed a short term loan. After Mr. Netwal received approval from two members of the board of directors, the debtor executed a promissory note dated June 17, 1985, in the amount of $125,000 to the Bank of Onalaska (the Note). At this time the Bank issued a money order dated June 17, 1985, in the amount of $25,000 to the debtor. The debtor signed a general business security agreement dated June 17, 1985, a collateral assignment of commissions dated June 17, 1985, and a financing statement. The debtor also delivered a chattel security agreement dated May 21, 1985. The collateral assignment of commissions was mailed to the All American Life Insurance Company, the source of the assigned commissions, on November 14, 1985; the financing statement was filed on December 8, 1985.

On Saturday, June 15, 1985, the debtor wrote two checks for a total of $100,000 on his new account with the Bank of Onalaska. The debtor deposited a check for $80,000 in his individual money market account with Nekoosa Port Edwards State Bank

and a check for $20,000 in his account with M & I Peoples Bank of Nekoosa. The Bank of Onalaska refused to honor the checks.

On Monday, June 17, 1985, Betty Rowe, manager of operations at Nekoosa Port Edwards State Bank, showed the debtor's $80,000 check for deposit to Mr. Sigler; Mr. Sigler instructed her to call the Bank of Onalaska. She called the Bank of Onalaska and asked the Bank's bookkeeping department if sufficient funds were in the debtor's account to cover the $80,000 check. She spoke with Ardis Warren, the Bank of Onalaska's head bookkeeper, who told her that papers were going through to cover the check. Betty Rowe relayed this information to Mr. Sigler. The Nekoosa Port Edwards State Bank paid the $75,000 check before midnight.

On Tuesday, June 18, 1985, Betty Freeman, employed as an assistant cashier and teller at M & I Peoples Bank of Nekoosa, called the Bank of Onalaska and asked Betty Falkenberg, bookkeeper at the Bank of Onalaska, whether the debtor had sufficient funds in his account to cover a check in the amount of $20,000. Betty Freeman called the Bank of Onalaska because the debtor's account was on a collected funds basis. Betty Freeman noted in the records of the M & I Peoples Bank of Nekoosa that an employee of the Bank of Onalaska checked with an officer of the Bank of Onalaska and said that the check was good. Betty Falkenberg testified that she referred the matter to her supervisor, Ardis Warren, who told her that a loan had not yet been approved. Betty Falkenberg testified that she told the caller that funds were not available.

On Thursday, June 20, 1985, Mr. Netwal returned from his business trip to Milwaukee.

On Friday, June 21, 1985, the Federal Reserve Bank informed the Nekoosa Port Edwards State Bank that a check drawn by the debtor on his account at the Bank of Onalaska in the amount of $80,000 was being returned for nonsufficient funds.

On Tuesday, June 25, 1985, Betty Freeman, assistant cashier and teller with M & I Peoples Bank of Nekoosa, called the Bank of Onalaska to see if the debtor's check for $20,000 had been paid. Betty Freeman noted in the records of M & I Peoples Bank that the check had not yet been paid.

On or about this time, Mr. Netwal spoke with the debtor about the status of the debtor's loan application and the debtor's returned checks. Mr. Netwal explained the conditions which the Bank required before the money would be advanced and the debtor explained the circumstances that caused him to write two bad checks.

On Wednesday, June 26, 1985, Mr. Netwal wrote a letter to Richard Lysy, president of M & I Peoples Bank of Coloma, Wisconsin, which read:

Dear Mr. Lysy:

At our board meeting on June 13, 1985, Vern Taggatz application and line of credit was discussed and under the conditions set forth on purchasing real estate and commercial property in our area and with review of collateral to be used on this line, the Board of Directors approved Vern's request. This transaction should be finalized within 45 days.

Sometime in July, 1985, the debtor met with Mr. Netwal and Mr. Raymond. After some discussions concerning the situation, Mr. Raymond severed the business relationship between himself and the debtor and the business relationship between the Bank of Onalaska and the debtor.

On August 21, 1985, Richard Lysy wrote a letter to Dan Netwal, which read:

Dear Mr. Netwal:

We will appreciate receiving a letter from you regarding the current status of Mr. Vern Taggatz application and line of credit. We are referring to your letter dated June 26th in which you indicated that your Board had approved Vern's request and that the transaction should be finalized within 45 days.

On September 16, 1985, the $125,000 Note became due. The debtor did not pay the balance due of $25,000. On December 12, 1985, the debtor was indicted for a check kiting scheme involving Nekoosa Port Edward Savings and Loan Association and the Wood County National Bank.

On January 24, 1986, the debtor filed a petition under chapter 11 of the Bankruptcy Code.

On March 18, 1986, the debtor was convicted of the above charge.

On May 9, 1986, the debtor was sentenced to five years in the custody of the Attorney General of the United States, restitution of $57,000 to Nekoosa Port Edwards Savings & Loan, a $50 criminal assessment penalty and voluntary surrender to a designated institution on May 30, 1986.

On May 30, 1986, the debtor reported to the Federal Correctional Institute, Oxford Camp, Wisconsin.

On May 7, 1987, this case was converted to Chapter 7.

## TRUSTEE'S ARGUMENT

The trustee argues that the remaining funds due under the Note constitute property of the estate and must be turned over to the trustee because a "hot note" is analogous to an irrevocable letter of credit.[1] The trustee did not explicitly define the term "hot note." However, the trustee implies that a "hot note" is a partially funded promissory note upon which the maker can demand funding at any time.[2] The trustee's argument consists of three premises. The trustee's first premise is that "[a] holder of an irrevocable letter of credit can demand payment by the issuing party for any reason as long as the term of the letter of credit has not expired." Trustee's Trial Brief at 2. The trustee's second premise is that "a Trustee of defunct beneficiary of a letter of credit can draw on said letter of credit." *Id.* The trustee also implies that a letter of credit is property of the estate of a defunct beneficiary. *Id.* The trustee's third premise is that a maker of a "hot note" can demand

---

1. Although letter of credit transactions vary, their basic structure is simple. In a typical letter of credit transaction the seller, also known as the beneficiary in the letter of credit transaction, enters into a sales contract with the buyer and specifies that payment be made with a letter of credit in his favor because he has little confidence in the buyer's ability to pay. The buyer, also known as the customer in the letter of credit transaction, contracts with a bank to issue the letter of credit. The bank, also known as the issuer in the letter of credit transaction, issues the letter of credit to the seller and becomes statutorily obligated to honor drafts drawn by the beneficiary that comply with the terms of the credit. J. White and R. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 18–2 at 711 (2d ed. 1980). In addition to these three parties a second bank, known either as an advising bank or a confirming bank in the letter of credit transaction, may receive the letter of credit from the issuer. An advising bank gives notice of the issuance of a letter of credit and a confirming bank engages to honor the letter of credit. *See* U.C.C. 5–107(1) and (2). In short, a letter of credit transaction consists of an underlying contract for goods or services between the beneficiary and the customer, a contract for the letter of credit between the customer and the bank, and a letter of credit. A letter of credit transaction may also consist of an advise of credit or a confirmation of credit, or both, if a second bank participates in the transaction.

   While a letter of credit transaction consists of three or more parties and three or more independent legal relationships, a mere letter of credit consists of only two parties—the issuer and the beneficiary—and one legal relationship. A letter of credit is an "engagement by the bank or other person made at the request of customer * * * that the issuer will honor drafts or other demands for payment on compliance with the conditions specified in the credit." U.C.C. 5–103(1)(a). Once the letter of credit is established under U.C.C. 5–106, the issuer is statutorily obligated to honor drafts drawn by the beneficiary that comply with the terms of the credit. The obligation of the issuer to pay the beneficiary on the letter of credit is independent of both the obligation of the customer to the beneficiary on the underlying contract and the obligation of the issuer to its customer on the contract for the letter of credit.

   Letters of credit are neither contracts nor negotiable instruments. A letter of credit is not a guaranty contract because the obligation of an issuer is primary and the obligation of an issuer arises upon presentment of documents in compliance with the letter of credit. The obligation of a guarantor is secondary and arises upon the principal debtor's default. A letter of credit is not a third party beneficiary contract because the claim of a beneficiary is not subject to the defenses the issuer might have against the customer on the contract for the letter of credit. A letter of credit is not a negotiable instrument because it is not payable to order or bearer, and it is typically conditional. A letter of credit is a letter of credit. *Id.* at 715.

2. The Court searched the GENFED, STATES and LAWREV files of the LEXIS databank and found no reference to the term "hot note."

full funding at any time. *Id.* The trustee's conclusion is that "the remaining funds due under the Note constitute property of the estate and must be turned over by the defendant to the Trustee pursuant to 11 U.S.C. § 542(b) and (c) and State contract law."[3] *Id.* at 3. The Court is unpersuaded by the trustee's analogy because the trustee's premises lack persuasive legal support and the trustee's argument lacks validity.

■ The trustee's first premise is an inaccurate statement of the law. The trustee states that "[a] holder of an irrevocable letter of credit can demand payment by the issuing party for any reason as long as the term of the letter of credit has not expired." Neither mere holder status under WIS.STAT. § 401.201(20) nor physical possession of a letter of credit will confer upon a person the right to demand payment under a letter of credit. A letter of credit is neither a negotiable instrument under WIS. STAT. § 403.104(1) nor a required part of a documentary draft under WIS.STAT. § 405.103(1)(b). Only a beneficiary under WIS.STAT. § 405.103(1)(d) is entitled to demand payment under a letter of credit. While a beneficiary may demand payment for any reason, the beneficiary's draft or demand for payment must comply with the terms of the letter of credit before the issuer's duty to pay arises under WIS. STAT. § 405.114. Accordingly, the Court gives little weight to the trustee's first premise.

The trustee's second premise and its implications find little support in the law one way or the other. The trustee states that "a Trustee of defunct beneficiary of a letter of credit can draw on said letter of credit" and the trustee implies that a letter of credit is property of the estate of a defunct beneficiary.[4] Trustee's brief at 2. The trustee cites *In re Swift Aire Lines, Inc.*, 20 B.R. 286 (Bankr.C.D.Cal.1982) and *Eakin v. Continental Illinois National Bank and Trust Co.*, 121 F.R.D. 363 (N.D. Ill.1988) for support. The Bankruptcy Ap-

---

**3.** The Court notes that the trustee did not originally plead the "hot note" theory. In his pleadings the trustee argued more conventionally that "the Funds constitute a matured debt that is payable to the estate upon the demand of the Trustee." Trustee's Complaint at 2. The Court finds that the debtor's claim against the Bank of Onalaska does not constitute a matured debt because the debtor failed to comply with the agreements and conditions precedent. Accordingly, the Bank of Onalaska does not have a duty to fund the remainder of the promissory note in question. *See Midlantic National Bank v. Commonwealth General, Ltd., and Melvin Kaplan*, 386 So.2d 31 (Fla.App.1980); *In re Cassidy Land and Cattle Co., Inc.*, 836 F.2d 1130 (8 C.A.1988); and *Northwest Capital Corp. v. Kimmel*, 34 Wis.2d 25, 148 N.W.2d 738 (1966).

**4.** The definition of property of the estate under 11 U.S.C. § 541 is as broad as the definition of a letter of credit is narrow. With only minor exceptions, property of the estate includes all property of the debtor as of the time of the filing of the bankruptcy petition. *See* 11 U.S.C. § 541. Of the seven numbered subparagraphs of 11 U.S.C. § 541, subparagraph one is by far the most comprehensive and significant. 11 U.S.C. § 541(a)(1) provides that property of the estate includes "all legal or equitable interests of the debtor in property as of the commencement of the case." Property of the estate thus includes both real property and personal property, both tangible and intangible property, both property in the debtor's possession and property that is held by others in which the debtor has an interest.

Whether a letter of credit is property of the estate is an unsettled issue. *Compare In re North Shore & Central Illinois Freight Co.*, 30 B.R. 377 (Bankr.N.D.Ill.1983) (customer filed bankruptcy and the court found that the funds which the issuer was obligated to pay to the beneficiary upon presentment of conforming documents were property of the issuer not the estate), *In re Swift Aire Lines, Inc.*, 20 B.R. 286 (Bankr.C.D.Cal.1982) (beneficiary filed bankruptcy and the court found that the funds the issuer was obligated to pay to the beneficiary were property of the estate) *and First Empire Bank–New York v. FDIC*, 572 F.2d 1361 (9th Cir.1978) (issuer was insolvent and the FDIC assumed the obligation), *with In re Twist Cap, Inc.*, 1 B.R. 284 (Bankr.D.Fla.1979) (holding that the payment to the beneficiary had to be stepped together with the issuer's secured reimbursement right and that the payment violated the Bankruptcy Code), *In re Swift Aire Lines, Inc.*, 30 B.R. 490 (Bankr.App. 9th Cir. 1983) (court only assumed that the letter of credit was property of the estate for the sake of arguing that the trustee didn't comply with the letter of credit) *and FDIC v. Philadelphia Gear*, 476 U.S. 426, 106 S.Ct. 1931, 90 L.Ed.2d 428 (1986). As the Court's decision in this matter does not depend on the truth or falsity of the trustee's second premise, the Court will not add its own dicta to the cacophony of opinions in this area.

pellate Panel for the Ninth Circuit overruled the Bankruptcy Court's decision in *In re Swift Aire Lines, Inc.*,[5] 30 B.R. 490 (Bankr.App. 9th Circuit 1983) and the Court in *Eakin* decided whether to impose Rule 11 sanctions upon the bank, an issue unrelated to the trustee's second premise.[6] Accordingly, this Court gives little weight to the trustee's second premise.

The trustee's third premise finds no support in the law. The trustee states that "[i]n banking parlance the Note became a "hot note" upon which the debtor could demand full funding at anytime." Trustee's Trial Brief at 2. The trustee also states that "[p]laintiff's expert will substantiate that this is the practice in the banking industry." *Id.* The trustee's expert did not substantiate the existence of "hot notes" during the trial and the trustee did not substantiate the legal existence of "hot notes" in his trial briefs. Accordingly, the Court gives no weight to the trustee's third premise.

The trustee's conclusion is that "the remaining funds due under the Note constitute property of the estate and must be turned over by the defendant to the Trustee pursuant to 11 U.S.C. § 542(b) and (c) and State contract law. *Id.* at 3. The trustee cites *Matter of Zimmerman*, 69 B.R. 436 (Bankr.E.D.Wis.1987) and *In re Stiennon*, 73 B.R. 905 (Bankr.W.D.Wis. 1987) for support of his conclusion. In *Matter of Zimmerman*, 69 B.R. 436 (Bankr.E.D.Wis.1987), the court decided that funds in the debtor's employee saving fund were not pledged in his employer's

---

**5.** In *In Re Swift Aire Lines Inc.*, 20 B.R. 286 (Bankr.C.D.Cal.1982), the creditor issued a letter of credit to the debtor's owner in favor of the debtor. The debtor filed a petition and the debtor's trustee demanded payment on the letter of credit. The creditor refused to honor the letter of credit. The court found that the trustee was the legal successor to the debtor's rights as beneficiary of the letter of credit and that the trustee had presented the requisite documents. Earlier, the bank had moved to dismiss for failure to state a claim upon which relief could be granted because the letter of credit was an executory contract to make a loan or extend financial accommodations to or for the benefit of the debtor which could be terminated under 11 U.S.C. § 365(e)(2). The court found that no executory contract existed between the debtor, the beneficiary of the letter of credit, and the creditor, the issuer of the letter of credit, because a letter of credit is a contract between the issuer and the customer, not the issuer and the beneficiary. *Id.* at 287.

In *In re Swift Aire Lines, Inc.*, 30 B.R. 490 (Bankr.App.1983), the Bankruptcy Appellate Panel of the Ninth Circuit reversed the Bankruptcy Court's decision denying Crocker's motion for summary judgment and granting the trustee's motion for partial summary judgment. The Appellate Panel applied the principle of strict compliance and found that "the trustee failed to, and was precluded from, presenting documents conforming to the requirements of the letter of credit." *Id.* at 496. The Appellate Panel also found that a letter of credit was an executory contract to make a financial accommodation to or for the benefit of the debtor's estate. *Id.*

**6.** In *Eakin v. Continental Ill. Nat. Bank and Trust Co.*, 121 F.R.D. 363 (N.D.Ill.1988), the court imposed Rule 11 sanctions against Continental for frivolously objecting to the court's decision to grant Eakin, the Indiana Insurance Commissioner and Liquidator of Allied Fidelity Insurance Company, specific performance of a letter of credit issued by Continental for the benefit of Allied. While the trustee's citation of the above case provided no authority for the trustee's position, it did lead the Court to three related cases.

In *Allied Fidelity v. Continental Ill. Nat. Bank and Trust Co.*, 677 F.Supp. 562 (N.D.Ill.1988), the Court denied Continental's motion to dismiss Allied's action to enforce a standby letter of credit. The Court found that pursuant to Ind.Code § 27-9-3-7(b) (1979) the Liquidator was the proper plaintiff, could substitute itself for Allied within 60 days and had provided Continental with conforming documents under the letter of credit for which it was a beneficiary.

In *Eakin v. Continental Ill. Nat. Bank and Trust Co.*, 687 F.Supp. 1259 (N.D.Ill.1988), the court granted the Liquidator's motion for summary judgment. The *Eakin* court found that the Liquidator could assume the debtor's role as beneficiary of the letter of credit issued by Continental because Continental would lose nothing by virtue of such an assignment: Continental would either have an equitable lien on the funds or a class 1 priority claim pursuant to Ind.Code § 27-9-3-40(1)(A) (1979). While a comparison of the Bankruptcy Code and provisions of the Indiana Code relating to the supervision, rehabilitation and liquidation of insurers doing business in Indiana may have proved fruitful to the trustee, such an analysis was not done! Accordingly, the Court finds the analogue between Indiana's insurance company liquidation statute and the Bankruptcy Code too insufficiently developed to persuasively support the trustee's argument.

favor to reduce a personal liability but were available to the trustee under 11 U.S.C. § 541. In *Matter of Stiennon*, 73 B.R. 905 (Bankr.W.D.Wis.1987), the court decided that funds held by the debtor's attorney in a trust account were property of the estate instead of property of the bank. Without any analysis from the trustee the Court fails to see how either of these cases supports the trustee's argument. Neither the *Zimmerman* court nor the *Stiennon* court considered the issue presently before this Court. Accordingly, the Court places no weight on either case. All in all, the Court finds that the trustee's expert witness and the trustee's cited authorities provide little or no support for the trustee's premises and the trustee's conclusion.

Even if the trustee's premises were correct, the trustee's argument would fail because the trustee's analogy is logically invalid. Essentially, the trustee argues that since a letter of credit can be drawn upon by its beneficiary, the debtor, and the trustee of the beneficiary's estate, and since a "hot note" can also be drawn upon by its maker, the debtor, then a "hot note" can also be drawn upon by the trustee of the maker's estate. It is invalid to argue that two objects which share one common characteristic must also share other common characteristics. An apple is red and edible but that does not lead one to the conclusion that a red beach ball is edible. For such an argument to be logical, one would have to premise that anything red is edible. In the present case, the trustee would have to argue that the trustee can draw upon anything that the debtor can draw upon. Such an argument was never made. Accordingly, the Court finds the trustee's analogy logically invalid.

Even if the trustee had created a logically valid analogy by arguing that the trustee can draw upon anything that the debtor can draw upon, the trustee's argument would still fail. Although property of the estate is a broad concept under 11 U.S.C. § 541(a)(1), subsections (b) and (c)(2) provide exceptions to the general rule that all legal or equitable interests of the debtor in property as of the commencement of the

case are property of the estate. Furthermore, each of the following six subparagraphs which help define property of the estate contain limits. Given the limits and exceptions to the concept of property of the estate, one cannot say that a trustee can draw upon anything that a debtor can draw upon. Furthermore, even if the Court assumes that "hot notes" exist and that the maker of a "hot note" may draw upon the "hot note" at anytime, without more information about the legal characteristics of a "hot note," the Court is unable to simply apply 11 U.S.C. § 541 to the trustee's "hot note" theory. Accordingly, the Court finds the trustee's argument implausible and unpersuasive.

## ANALYSIS

An executory contract exists when performance remains due to some extent on both sides. H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 347 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6303–6304. A trustee may assume or reject an executory contract unless such a contract is "a contract to make a loan, or extend other debt financing or financial accommodations, to or for the benefit of the debtor, ..." 11 U.S.C. § 365(a) and (c)(2). The Legislative History to 11 U.S.C. § 365(c)(2) provides:

> The purpose of this subsection, at least in part, is to prevent the trustee from requiring new advances of money or other property. The section permits the trustee to continue to use and pay for property already advanced, but is not designed to permit the trustee to demand new loans or additional transfers of property under lease commitments.

> Thus, under this provision, contracts such as loan commitments and letters of credit are nonassignable, and may not be assumed by the trustee.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 348 (1977); Senate Report No. 95–989, 95th Cong., 2d Sess. 59 (1978); U.S.Code Cong. & Admin.News 1978, pp. 5787, 6204.

In the present case, the debtor signed a promissory note for $125,000 and the Bank

advanced $25,000 to the debtor. At the time the debtor filed his petition for relief with the Bankruptcy Court, the debtor had neither paid the Note in full nor fulfilled the contract's conditions precedent [7] while the Bank had not funded the Note any further. It is clear, that performance remained due on both sides. Accordingly, the Court finds that the agreement between the debtor and the Bank of Onalaska is an executory contract.

The trustee argues that 11 U.S.C. § 365 does not apply because a "hot note" is not an executory contract. A "hot note" is not an executory contract because the only performance that remains is repayment.[8] The trustee reasons as follows:

[T]he debtor and the [B]ank had gone beyond the loan commitment stage and had consummated it in the form of a $125,000.00 note (the "Note"). The Note was funded on a late Friday evening with $25,000.00 and, according to the Debtor, the balance was to be funded first thing the following Monday morning when the defendant Bank had regular banking hours. At this point, the contract is no longer executory since the only perform-

ance that remained was repayment by the Debtor. The Note was a "hot note" in banking parlance and the Debtor could rely on receiving the entire $125,000.00 he had promised to repay. As the defendant aptly noted in his citation of the legislative history of 11 U.S.C. § 365: "A note is not usually an executory contract if the only performance that remains is repayment."

Trustee's Brief in Opposition to Defendant's Motion for Judgment on the Pleadings at 3. The trustee cites Countryman, *Executory Contracts in Bankruptcy: Part I,* 57 Minn.L.Rev. 439 (1973), *Id.* at 4, and *In re Arlene Whatley,* 16 B.R. 394 (Bankr.N.D.Ohio, 1982), Trustee's Trial Brief at 3, for support.

The trustee's cited authority does not support the trustee's argument. Both *In re Arlene Whatley* and *Executory Contracts in Bankruptcy* stand for the proposition that full funding of a promissory note creates a nonexecutory contract because the failure to complete performance would not be sufficiently material to excuse performance by the debtor.[9] 16 B.R.

---

**7.** During the trial the trustee objected to any testimony regarding oral conditions precedent because such testimony violated the parol evidence rule. The Court overruled the trustee's objection because notes are not fully integrated documents and parol evidence is always admissible with respect to the issue of integration. *Federal Deposit Insurance Corporation v. First Mortgage Investors,* 76 Wis.2d 151, 250 N.W.2d 362 (1977). Even if such evidence had been excluded, the Court's conclusion would remain the same. Instead of concluding that the trustee may not assume the partially funded promissory note because the agreement to fund the promissory note upon fulfillment of conditions precedent constitutes an executory contract to make a financial accommodation under 11 U.S.C. § 365(c)(2), the Court would have concluded that the trustee may not assume the partially funded promissory note because the partially funded promissory note constitutes an executory contract to make a financial accommodation under 11 U.S.C. § 365(c)(2). *See infra* at 992.

**8.** "A note is not usually an executory contract if the only performance that remains is repayment. Performance on one side of the contract would have been completed and the contract is no longer executory." H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 347 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6303–6304.

**9.** In *In re Whatley,* 16 B.R. 394 (Bankr.N.D.Ohio 1982), the debtor filed a motion to compel reaffirmation of an installment loan secured by a motor vehicle on the grounds that such a contract was an executory contract subject to acceptance or rejection under 11 U.S.C. § 362. *Id.* at 395. The court found that the installment contract was not an executory contract because the creditor "had no further duties to the Debtor other than cancellation of its lien on debtor's automobile." *Id.* at 398.

The performance remaining to be done under the contract was the repayment, by debtor, of the loan; performance which, in the view of the drafters of the Legislative History for this section, is insufficient to make a contract executory. Moreover, even when considering that upon full repayment BancOhio would be required to cancel the lien, such a duty is not sufficient to make the contract executory. The failure of BancOhio to cancel the lien would not be a material breach so as to excuse Debtor from further performance for by the time cancellation of the lien is necessary, Debtor would have fully performed.

In *Executory Contracts in Bankruptcy: Part I,* Countryman codified the case law which defined executory contracts under the Bankruptcy Act.

at 398 and 57 Minn.L.Rev. at 451–458. Such a contract should not be treated as an executory contract. The trustee's rejection of such a contract would neither add to nor detract from the estate's assets or liabilities; the trustee's assumption of such a contract would convert the other contracting party's claim into a first priority administrative expense without any benefit to the estate. 57 Minn.L.Rev. at 457. Conversely, partial funding would constitute partial performance and create an executory contract. Characterizing a partially funded promissory note as a "hot note" does nothing to change the executory nature of the note at issue. The term "hot note" is not a legal term of art but two words which taken together have no legal significance. Accordingly, the Court is unconvinced that a partially funded promissory note is a nonexecutory contract and that 11 U.S.C. § 365 does not apply to the present case.

The facts in the present case are similar to fact patterns which have been characterized as contracts for financial accommodation under 11 U.S.C. § 365(c)(2). In *In re Continental Experts Enterprises Inc.,* 26 B.R. 308 (Bankr.S.D.Fla.1982) the court stated:

... the debtor executed and delivered a note and mortgage to the defendants in the amount of $60,000 payable with interest at the end of one year. The debt was never completely funded by the defendants who advanced a total of $41,000 in increments between May 14 and July 31, 1981, leaving a balance to be funded of $19,000. The loan was for the purpose of enabling the debtor to complete the construction of an apartment building. The debtor has not completed the construction and has not been able to get a certificate of occupancy for any of the apartments. No part of the advances or interest have ever been paid.

26 B.R. at 309. The court held "that the $19,000 remaining to be funded on this loan falls within the scope of § 365(c)(2) which prohibits the trustee or (by virtue of § 1107) this chapter 11 debtor from assuming an executory contract" for financial accommodation. *Id.* Accordingly, the bank's "obligation to complete funding as contemplated by the note and mortgage is, of course, an executory contract. Because of the foregoing prohibition, the debtor cannot assume that contract and, therefore, there is no continuing obligation on the defendants' part to complete the funding." *Id.* In *In re New Town Mall,* 17 B.R. 326 (1982), Mutual Benefit Life Insurance Company issued a $6,800,000 twenty-five year loan commitment to the debtor for a fee of $136,000. The Court stated:

Page 1 of the Commitment requires timely compliance with all conditions of the Commitment prior to disbursement of any funds. Paragraph 22 of the Commitment requires satisfactory financial statements evidencing the borrower's solvency prior to disbursement of funds. Debtor has offered no evidence of compliance with paragraph 22.

17 B.R. at 327. The court held that the loan commitment was not assignable or assumable by the debtor-in-possession. *Id.* at 328. Whether one characterizes the transaction as a partially funded promissory note or as a loan commitment [10], it is clear that case law supports the Court's decision.[11] Accordingly, the Court finds that the partially funded promissory note

---

Thus, by a process similar to one method of sculpting an elephant [85] we approach a definition of executory contract within the meaning of the Bankruptcy Act: a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other. (Footnote omitted.)

[85] Obtain a large piece of stone. Take hammer and chisel and knock off everything that doesn't look like an elephant.

*Id.* at 460.

10. The debtor testified that he believed the transaction was a loan commitment; the loan officer from the Bank of Onalaska testified that the transaction was a loan of $25,000. The Court characterizes the transaction as a partially funded promissory note.

11. *See In re Swift Aire Lines Inc.,* 30 B.R. 490, 496 (Bankr.App.1983) (A "letter of credit was an executory contract to make a financial accommodation to and for the benefit of the [debtor's] estate" because the legislative history of 11 U.S.C. 365(c) states that "contracts such as loan commitments and letters of credit are non-as-

at issue in the present case is an executory contract for financial accommodation.

For the reasons stated above, the Court holds that an agreement to fund the unfunded portion of a promissory note upon fulfillment of conditions precedent constitutes an executory contract under 11 U.S.C. § 365, and that an agreement to fund the unfunded portion of a promissory note constitutes a contract to make a loan, or extend other debt financing or financial accommodations pursuant to 11 U.S.C.

§ 365(c)(2). Accordingly, the trustee may not assume the agreement between the debtor and the Bank.

This decision shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil Procedure.

signable, and may not be assumed by the trustee."); *In re Wegner Farms Co.,* 49 B.R. 440 (Bankr.N.D.Iowa 1985) (Surety bond agreement is an agreement to provide financial accommodation because it "obligates Merchants to make good on certain financial liabilities of the debtor in the event the debtor does not or cannot pay. Moreover, the issuance of a bond is intimately connected to debtor's financial integrity."); *In re Adana Mortgage Bankers, Inc.,* 12 B.R. 977 (Bankr.N.D.Ga.1980) (Agreements guarantying mortgage backed securities issued by debtor mortgage banker were executory contracts providing "financial accommodations" under 11 U.S.C. § 365(c)(2) because the guarantor is ultimately responsible for the debtor's financial obligations and the guaranty enables the debtor to obtain credit in the secondary mortgage market by issuing securities guarantied by the government.); *In re Placid Oil Company,* 72 B.R. 135 (Bankr.N.D.Tex.1987) (If characterized as an executory contract, an agreement to provide insurance services in advance of payment was a "financial accommodation" under 11 U.S.C. § 362(c)(2) because demand notes were used to pay the estimated premiums which were later redeemable upon payment of the actual premium. The actual premium was based upon the amount of the insured claims that were finally paid.); *In re Advanced Professionals Home Health Care Inc.,* 82 B.R. 837 (Bankr.E.D.Mich.1988) (Agreement between a health care provider and a fiscal intermediary which requires the fiscal intermediary to make interim payments to the provider based on estimates and to reclaim overpayments from future payments based on an annual accounting was a "financial accommodation" under 11 U.S.C. § 362(c)(2) because Congress intended to create this source of working capital for providers and the financial intermediary may charge interest on any amount past due.); *In re Postle Enterprises, Inc.,* 48 B.R. 721, 725 (Bankr.D.Ariz.1985) (Agreement requiring a lessor to provide $150,-000.00 in construction to a debtor-tenant postpetition is a contract to make a loan, extend debt financing or financial accommodation within the meaning of 11 U.S.C. § 365(c)(2) because the lessor was required to borrow the funds to finance the construction thereby incur-

ring lending fees, finance charges and interest expense.)

Decisions which refuse to characterize the transaction at issue as a financial accommodation under 11 U.S.C. § 365(c)(2) describe different fact patterns than the case at bar. *In re United Press International, Inc.* 55 B.R. 63 (Bankr.D.D.C.1985) (A non-residential lease agreement requiring lessor to expend money in order to prepare offices for debtor's occupancy was *not* a "financial accommodation" under 11 U.S.C. § 365(c)(2) because the debtor will receive office space built to his specifications but no fiscal benefit similar to a loan or letter of credit.); *In re Peaches Records and Tapes, Inc.,* 51 B.R. 583, 590 (Bankr.App. 9th Cir.1985) (An agreement providing "for the payment of additional rents based upon a percentage of gross sales does *not* represent a financial accommodation which renders the sublease unassumable and its *ipso facto* clause enforceable" because the 'percentage of gross sales' is merely one of the means adopted by the parties to measure the rental value of the property.); *In re Farrell,* 79 B.R. 300, 304 (Bankr.S.D.Ohio 1987) (Agreement for lease of van between lessor and debtor was *not* a "contract to make a loan or extend other debt financing" under 11 U.S.C. § 365(c)(2) because lessor "is under no obligation to provide advances of cash or new property."); *Matter of Ross,* 88 B.R. 471 (Bankr.M.D.Ga.1988) (Agreement to provide blank airline tickets and clearinghouse services to travel agents did *not* constitute a contract to provide financial accommodation because the Airline Reporting Company never intended to extend credit to the debtor.); and *In re Karsh Travel, Inc.,* 87 B.R. 110 (Bankr. N.D.Cal.1988) (Agreement as in *Matter of Ross* was not an agreement to provide financial accommodation. The mere fact the a contract has as its subject property of value which is easily convertible to cash does not turn it into a contract to make a loan.). In each of the above cases, 11 U.S.C. § 365(c)(2) did not apply because money was delivered in exchange for goods or services instead of a promise to pay. In the present case, upon completion of conditions precedent money was to be delivered in exchange for a promise to pay. Accordingly, the Court distinguishes the present case from those above.