Marvin L. WARNER, Plaintiff-Appellant (85–3032), Plaintiff-Appellee, Cross-Appellant (85–3489/90).

v.

The CENTRAL TRUST COMPANY, et al., Defendants,

Federal Deposit Insurance Corp., Receiver of Penn Square Bank, N.A., Defendant-Appellee (85–3032), Defendant-Appellant, Cross-Appellee (85–3489/90).

Nos. 85–3032, 85–3489 and 85–3490.

United States Court of Appeals, Sixth Circuit.

Argued April 15, 1986.

Decided Aug. 11, 1986.

---

168

Louis F. Gilligan (argued), Cincinnati, Ohio, for appellant.

W. Stuart Dornette (argued), Cincinnati, Ohio, for appellee.

Before LIVELY, Chief Judge, and MERRITT and JONES, Circuit Judges.

NATHANIEL R. JONES, Circuit Judge.

In July 1982, the Federal Deposit Insurance Corporation ("FDIC") closed and took over as receiver of the insolvent Penn Square Bank of Oklahoma City. One of the bank's assets was a letter of credit issued to Penn Square by the Central Trust Company of Cincinnati on the account of Marvin Warner, which the FDIC has since collected. Warner appeals the district court's ruling that the FDIC was entitled to collect on the letter of credit. The FDIC appeals the court's method of calculating the interest due it from Warner. For the reasons stated below we reverse and remand for further consideration.

The background facts are largely conceded. The letter of credit was issued to Penn Square as part of a complex financing scheme that surrounded Warner's investment in a limited partnership called High Plains Drilling Partners 1980–II (the "Partnership"). The Partnership was formed under Oklahoma law; its purpose was to purchase oil drilling rigs from the general partner, High Plains Drilling Company ("High Plains"), and lease them to drillers. Carl Swan, the owner of High Plains, was also a director of Penn Square.

Warner's total investment was $498,150. He paid half in cash; the other half was financed by a note from Warner to the Partnership for $249,075. Because the Partnership needed the full investment in cash to begin operations, it arranged to borrow from Penn Square the amount of all the limited partners' financed indebtedness. This transaction became known as the "Equity Loan." Warner and the Partnership signed an "Equity Loan Assumption Agreement" wherein Warner agreed to assume the Partnership's obligations on the Equity Loan up to the amount of his financed investment and agreed to furnish a letter of credit in that amount, which was to be transferred to Penn Square as collateral for the Equity Loan. The Partnership and Penn Square then executed a promissory note for the Equity Loan and a "Secured Term Loan Agreement." The Equity Loan was a no-recourse loan—that is, on default, neither the Partnership nor any partner could be held personally liable on the note and Penn Square could look only to the letters of credit it had received from the various limited partners, including Warner, for satisfaction of the debt. When these documents were finally executed there

were discrepancies between the terms of the Equity Loan as set out in the Equity Loan Assumption Agreement between Warner and the Partnership and as set out in the Promissory Note and Secured Term Loan Agreement between the Partnership and Penn Square. These discrepancies, which will be described further below, form the basis of Warner's claim against the FDIC.

These agreements were entered into in 1980, and the Partnership prospered initially. By 1982, however, the oil industry had collapsed, which precipitated two events. First, the Partnership, unable to lease its oil rigs, could not meet its debts to Penn Square. Second, Penn Square, with heavy investments in the oil industry, became insolvent and was taken over by the FDIC. The Partnership's note to Penn Square matured shortly thereafter. The FDIC refused an extension and gave notice that it would collect on the letters of credit. Warner brought suit in Hamilton County Court of Common Pleas to enjoin collection of his letter, claiming fraud by Penn Square, High Plains, and Carl Swan, and raising a contract claim on the validity of the transactions. The case was removed to the federal district court. That court denied Warner's motion for a preliminary injunction, and this court affirmed. *See Warner v. Central Trust Co.*, 715 F.2d 1121 (6th Cir. 1983). The letter of credit was collected and the case proceeded to trial on the merits. All defendants but the FDIC were voluntarily dismissed. The district court ruled against Warner on both the fraud and contract claims; only the contract claim is appealed.

In addition to the Equity Loan, the Partnership had also obtained a Working Capital Loan from Penn Square of which Warner had assumed a pro rata share by a separate agreement. The Partnership defaulted on this loan as well. Warner did not contest his obligation to pay on that debt. The FDIC was awarded interest and attorneys fees in connection with the collection on both loans. The FDIC's appeal concerns the manner in which those awards should be calculated.

## I.

While Warner presented both fraud and contract claims in the district court, he raises only the contract issue on appeal. The gist of his argument is that, because the terms of the Equity Loan executed between Penn Square and the Partnership were materially different than the terms of the loan he agreed to assume in his contract with the Partnership, he is entitled to release from the assumption and return of the collateral—the letter of credit.

The original intended structure of the Equity Loan from Penn Square to the Partnership was set out in the Equity Loan Assumption Agreement executed by Warner and the Partnership. The Equity Loan was to be for four years. The principal was to be paid by the Partnership to Penn Square in sixteen equal quarterly installments, which were to coincide with the installments Warner was to pay to the Partnership under the Warner/Partnership note. As security to Penn Square, Warner was to assume a pro rata share of the Equity Loan and supply a letter of credit which would be transferred to Penn Square as collateral. The letter of credit was also to have a term of four years, and was to be in the amount of 110% of Warner's share of the loan. The extra 10% was to secure interest payments, which were assumed by the Partnership.

The original structure for these transactions proved impracticable. Some banks refused to extend letters of credit for four years, and the Partnership notified Warner and the other limited partners that they could submit letters with terms of two years, renewable for another two years, and for only 100% of the financed amount. (Warner thereafter submitted a letter issued by Central Trust with a twenty-one month term, renewable for one year.) Because the security provided by the letters of credit would be for only two years, the Partnership and Penn Square restructured the Equity Loan. As executed, the loan matured in August 1982 rather than June

1985. Interest was to be paid quarterly (and was two percent less than originally planned), but no principal was due until maturity. According to the Secured Term Loan Agreement, the principal would be paid from the letters of credit. In the paragraph of this agreement titled "Security," the Partnership agreed to assign the letters of credit to Penn Square, and the Equity Loan Assumption Agreements made with each limited partner were incorporated. The district court found that there was "an understanding among the parties" (presumably the Partnership and Penn Square) "that the Equity Loan would be rolled over for another two years at the end of its initial term." J.App. Vol. I at 78. Warner claims he was never informed of the changes in the terms of the Equity Loan. He was, however, informed of the change in the letter of credit requirements and, since the Partnership was not required to make quarterly principal payments on the Equity Loan, the Partnership told him he did not need to make such payments to the Partnership as required by the Equity Loan Assumption Agreement.

Warner was not a party to the Equity Loan or the Secured Term Loan Agreement. Penn Square was not a party to the Equity Loan Assumption Agreement. Thus, Warner cannot complain that Penn Square, or, in its shoes, the FDIC, breached any agreement between them. However, Warner argued below that he was a surety or guarantor of the Partnership's obligation to Penn Square under the Equity Loan and, as such, was exonerated by the change in the terms of that obligation. The FDIC argued, and the district court agreed, that Warner cannot be a guarantor because he provided a letter of credit. While a guarantor is secondarily liable, the court ruled, "the issuer of a letter of credit ... is primarily liable" for the underlying obligation. J.App. Vol. I at 90–91.

The legal proposition that the issuer of a letter of credit is not a guarantor can be accepted, *see e.g., Barclays Bank D.C.O. v. Mercantile National Bank*, 481 F.2d 1224, 1236 (5th Cir.1973), *cert. dismissed*, 414 U.S. 1139, 94 S.Ct. 888, 39 L.Ed.2d 96 (1974); *Dubuque Packing Co. v. Fitzgibbon*, 599 P.2d 440, 441 (Okla.Ct.App.1979), but it has no bearing on this case. Warner is not the "issuer" of the letter of credit. Warner is the "customer" who ordered the letter of credit; Central Trust Company is the "issuer." *See* Ohio Rev.Code Ann. §§ 1305.01(A)(3) & (7) (Baldwin 1971). The rule and cases cited by the FDIC could be used to determine who, as between Warner and Central Trust, is primarily liable for the obligation, were that an issue here. The issue is, however, whether Warner owed an obligation to Penn Square at all. We do not understand the FDIC to argue that Penn Square could legitimately collect the proceeds of the letter of credit absent a binding obligation on Warner to provide the letter. Nor does the FDIC argue that they have any greater rights to the letter of credit than did Penn Square. Warner provided the letter of credit as collateral for the Equity Loan. It is irrelevant that the collateral was in that form; it could as easily have been cash, a pledge of securities, or a secured interest in property. The court and the FDIC erred in focusing on the letter to determine the nature of Warner's obligations.

As an alternative basis, the district court held, and the FDIC argues on appeal, that Warner cannot be a guarantor of the Equity Loan because "the debt was his own," a recognition of the fact that the loan was obtained to finance the contribution to the Partnership of Warner and the other limited partners. If the debt was Warner's own, but, as the FDIC vigorously argues, Penn Square made no agreement with Warner, it seems to us that only one possibility remains—that the Partnership acted as Warner's agent to obtain the equity loan.

We need not decide, however, between the agency or guarantor arguments, for whether Warner was a guarantor of the Partnership debt to Penn Square or whether Warner was the principal on the loan and the Partnership his agent, the outcome in this case is the same. A guarantor is exonerated from his obligation "if

by any act of the creditor, without the consent of the guarantor, the original obligation of the principal is altered in any respect." Okla.Stat.Ann. tit. 15 § 338 (West 1966). Thus, the change in the terms of the Equity Loan from those set forth in the Equity Loan Assumption Agreement would exonerate Warner as guarantor unless he knew or had reason to know of those changes and assented to them. Similarly, under general agency principles Warner would not be bound by the act of his agent in agreeing to the altered Equity Loan unless the agent—the Partnership—had actual or apparent authority to make such changes. *See* Restatement (Second) of Agency § 140 (1957). Because the Equity Loan Assumption Agreement signed by Warner was incorporated into the security agreement between the Partnership and Penn Square, the bank had actual notice of the limits of the Partnership's authorization in obtaining the Equity Loan and, therefore, Penn Square cannot claim to rely on the Partnership's apparent authority. *Id.* §§ 166, 167. Of course, an *ultra vires* act of an agent can still bind the principal if the latter assented to, or ratified, the unauthorized agreement. *Id.* §§ 143, 82, 94. Thus, the question again is whether Warner knew or had reason to know of the alteration of the Equity Loan and, through his silence, assented to the changes.

The district court, having determined that Warner was not a guarantor, did not consider whether Warner knew of and assented to the change in the Equity Loan. However, while discussing Warner's fraud claim, the court in passing considered whether the Partnership had breached its contract with Warner. Footnote three of the opinion reads as follows:

> Although the breach of contract question is not before the Court, there is much evidence to support an argument that there was no breach of contract here.... [I]t *could be said that* plaintiff agreed to a modification of his contract when he accepted the benefits of the change in the terms of the Equity Loan, i.e., the less costly letter of credit,

and release from making quarterly payments of his promissory note.

J.App. Vol. I at 87 (emphasis added). Although the court has approached the proper issue in this passage, we do not construe the last quoted sentence as a finding that Warner agreed to the changes in the Equity Loan. The statement is *dicta* and the introductory clause, "it could be said that," is indecisive. We cannot determine whether the court gave the full consideration to this issue that was afforded to its more definite findings. Moreover, the statement addresses the question whether Warner agreed to a modification of his Assumption Agreement with the Partnership, not the related, but still distinct question, whether he assented to the change in the Equity Loan. We will therefore remand the case so that the district court may decide directly the issue we have raised.

## II.

■ The FDIC has raised two issues regarding its counterclaims against Warner. The FDIC brought a counter-claim for interest on the letter of credit for the eleven-month period that collection of the letter was delayed. It asserted that Warner tortiously interfered with the collection of the letter by bringing this action and that he was unjustly enriched by the delay. The court made no findings with regard to these claims but did award the FDIC interest on the letter at the 6% statutory rate provided for under Oklahoma law. *See* Okla.Stat.Ann. tit. 15 § 266 (West Supp. 1985–1986). The FDIC argues that an Ohio statutory rate should be applied and refers us to the rule in diversity cases that the law of the forum state controls. *See, e.g., Rhea v. Massey-Ferguson, Inc.,* 767 F.2d 266 (6th Cir.1985); *Farmers Chemical Ass'n v. Maryland Casualty Corp.,* 421 F.2d 319 (6th Cir.1970). This case does not arise under diversity jurisdiction, however, and it is well settled that federal, not state, law governs in actions involving the FDIC. *See D'Oench, Duhme & Co. v. F.D.I.C.,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). The federal court does

not sit as a state court in these cases as it does when diversity jurisdiction is invoked, although the court may look to the appropriate state law to provide a federal rule of decision when a uniform national rule is not needed. *See United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 727–28, 99 S.Ct. 1448, 1457–58, 59 L.Ed.2d 711 (1979). The district court demonstrated its awareness of these principles in incorporating state law and in ruling that Oklahoma provided the appropriate state law for these primarily Oklahoma-based transactions. We find no cause to reverse the court on this issue.

The FDIC also appeals the application of the Oklahoma statutory rate to the award of interest on the Working Capital Loan of which Warner had assumed a pro rata share. The loan agreement specified an interest rate tied to the market rate. The district concluded that the FDIC was entitled to the agreed-to rate but ruled on May 21, 1985, that "no evidence has been submitted as to what that figure might be" for the period between trial and the entry of judgment. The record reflects that on May 17, five days before the court order, the FDIC submitted the affidavit of A.L. "Jack" Cranfill wherein the contract rate and interest due for the period is stated. Because the court stated simply that "*no evidence has been submitted*" we cannot determine whether this affidavit was overlooked or was considered but found to be insufficient proof. We therefore remand for clarification of the court's ruling.

The judgment of the district court is **REVERSED** and the case is **REMANDED** for further consideration consistent with this opinion.