**In re CARLEY CAPITAL GROUP, Debtor.**

**Thomas G. BEACH, Charles A. Carpenter, Charles R. Carpenter, Charles I. Trainer, Baker G. Clay, and Daniel J. McCarty, Plaintiffs,**

v.

**FIRST UNION NATIONAL BANK OF NORTH CAROLINA, Defendant.**

**Bankruptcy No. MM11–89–00587. Adv. No. 89–0223–11.**

United States Bankruptcy Court, W.D. Wisconsin.

May 25, 1990.

Kenneth B. Axe, Lathrop & Clark, Madison, Wis., J. Michael Booe, Petree, Stockton & Robinson, Charlotte, N.C., for defendant.

Michael B. Van Sicklen, Foley & Lardner, Madison, Wis., Daniel W. Stolper, Stafford, Rosenbaum, Rieser & Hansen, Madison, Wis., for plaintiffs (except Daniel J. McCarty).

Anne W. Reed, Reinhart, Boerner, Van Deuren, Norris & Rieselbach, Milwaukee, Wis., for Daniel J. McCarty.

## MEMORANDUM DECISION

ROBERT D. MARTIN, Chief Judge.

Plaintiffs, Thomas G. Beach, Charles A. Carpenter, Charles R. Carpenter, Charles I. Trainer, Baker G. Clay, and Daniel J. McCarty ("Plaintiffs"), have sued First Union National Bank of North Carolina ("First Union"), seeking release from obligations related to a letter of credit, money damages, subrogation rights, and recovery of litigation expenses. First Union has moved to dismiss Plaintiffs' amended complaint pursuant to Bankruptcy Rule 7012(b) and FRCP 12(b)(6).

Taking the well-pleaded allegations of Plaintiffs' amended complaint as true,[1] it appears that on or about August 29, 1985, the debtor in the principal case, Carley Capital Group ("CCG"), executed a Deed of Trust Note (the "Note"), pursuant to which it agreed to pay First Union $6,800,000.00; the Note was secured by, *inter alia,* a duly-recorded Deed of Trust. First Union subsequently requested or required additional protection against defaults by CCG.

On or about June 15, 1987 Plaintiffs agreed with CCG to secure for a limited term up to $1,000,000.00 of the amount owing under the Note by purchasing a letter of credit which would provide First Union the requested additional security. (Plaintiffs allege that they agreed with CCG to "guarantee" the Note to the extent of $1,000,000.00, but no written guaranty is in existence.) Accordingly, Plaintiffs arranged for First Wisconsin National Bank of Milwaukee ("First Wisconsin"), to issue an irrevocable letter of credit to First Union. On June 11, 1987 First Wisconsin issued a irrevocable standby letter of credit to First Union (the "Letter of Credit"). The Letter of Credit provided that an amount not exceeding $1,000,000.00 would be available to First Union upon its presentation to First Wisconsin of a sight draft stating either:

Carley Capital Group, its successors or assigns, is not in compliance with all the terms and conditions of the agreements pertaining to the USD 6.8 Million credit facility for development of the One University Place Office Building at University Place in Charlotte

or:

Carley Capital Group, its successors or assigns, has not provided a satisfactory Standby Letter of Credit more than sixty (60) days prior to the expiration date of this Letter of Credit from an issuer acceptable to First Union and with a matu-

---

1. "While well-pleaded allegations of the complaint are taken as true for purposes of deciding a motion to dismiss, sweeping conclusions of law and unwarranted deductions of fact are not to be taken as true." *Frederiksen v. Poloway,* 637 F.2d 1147, 1150 n. 1 (7th Cir.1981), *cert. denied* 451 U.S. 1017, 101 S.Ct. 3006, 69 L.Ed.2d 389 (1981), citing *Mitchell v. Archibald & Kendall, Inc.,* 573 F.2d 429, 432 (7th Cir.1978).

rity date and other provisions which are acceptable to First Union.

The Letter of Credit was stated to expire on July 1, 1988.

On July 1, 1987 CCG and First Union entered into an agreement pursuant to which First Union extended an additional $2,500,000.00 credit facility to CCG, ("Refinancing Agreement"), and consolidated and cross-collateralized all outstanding obligations from CCG to First Union, ("Consolidated Obligations"), including the Note. Total outstanding obligations as of July 1, 1987 were approximately $17,000,000.00 plus accrued interest. The Refinancing Agreement was subsequently amended five times. The amendments provided for, *inter alia*, the release of collateral, with portions of the proceeds from sales applied to the Consolidated Obligations; the extension of maturity dates of overdue Consolidated Obligations; and the advancement of additional funds to be included among the Consolidated Obligations. First Union and CCG did not obtain Plaintiffs' consent to the Refinancing Agreement or any of the amendments.

On June 29, 1988 the Letter of Credit was amended by replacing the words "sixty (60) days" with "thirty (30) days," and its term was extended until October 1, 1988. By amendment dated September 14, 1988 the term of the Letter of Credit was again extended, with a new expiration date of July 1, 1989.

On June 19, 1989 First Union drafted against the Letter of Credit the full amount of $1,000,000.00. On or about June 21, 1989 First Wisconsin paid the draft to First Union. Plaintiffs do not contend that the Letter of Credit was improperly drafted upon.

The sole issues to be decided on this motion are: 1) whether Plaintiffs are entitled to assert a guarantor's defenses to payment of the Letter of Credit, and 2) whether Plaintiffs are entitled to be subrogated to First Union's rights against CCG. For the reasons elaborated upon below the Plaintiffs are not entitled to assert a guarantor's defenses to payment of the Letter of Credit, nor are they entitled to be subrogated to First Union's rights against CCG.

■ Plaintiffs contend that they should be characterized as guarantors or sureties so as to allow them to assert a guarantor's defenses to payment. Some review of the background for letters of credit and the structure of letter of credit transactions is essential to proper evaluation of Plaintiffs' contention.

Two types of letters of credit exist, the "commercial" or "sale" letter of credit and the "standby" letter of credit. The difference between the two has been described as follows:

"The standby letter of credit, unlike the commercial letter of credit, has been developed to assist in loan transactions by assuring payment in the event of a default. In a commercial letter of credit, the letter supports the sale contract. In the case of a standby letter of credit the letter supports, essentially, an underlying debt contract. It is used, primarily, to upgrade the credit of the borrower."

Baldwin B. Tuttle, *Letters of Credit,* in THIRD PARTY GUARANTIES: ENHANCING YOUR BORROWING OPTIONS 1, 5–6 (Law Journal Seminars–Press, Inc., 1981).

"Letters of credit are governed by ch. 405, Stats., art. 5 of the Uniform Commercial Code." *Werner v. A.L. Grootemaat & Sons, Inc.,* 80 Wis.2d 513, 522, 259 N.W.2d 310 (1977). Wis.Stat. § 405.103(1)(d) (1984) defines "letter of credit":

"Credit" or "letter of credit" means an engagement by a bank or other person made at the request of a customer and of a kind within the scope of this chapter (s. 405.102) that the issuer will honor drafts or other demands for payment upon compliance with the conditions specified in the credit. A credit may be either revocable or irrevocable. The engagement may be either an agreement to honor or a statement that the bank or other person is authorized to honor.

The irrevocable Letter of Credit in our case meets the description contained in Wis.Stat. § 405.103(1)(d) (1984).

Wis.Stat. § 405.103(1)(e) (1984) defines "customer" (also known as "account party") as "a buyer or other person who causes an issuer to issue a credit. The term also includes a bank which procures issuance or confirmation on behalf of that bank's customer." An "issuer" is "a bank or other person issuing a credit." Wis. Stat. § 405.103(1)(g) (1984). A "beneficiary" of a letter of credit is "a person who is entitled under its terms to draw or demand payment." Wis.Stat. § 405.103(1)(b) (1984). Thus, in our case, Plaintiffs are the "customers," First Wisconsin is the "issuer," and First Union is the "beneficiary."

A letter of credit transaction normally consists of "an underlying contract for goods or services between the beneficiary and the customer, a contract for the letter of credit between the customer and the bank, and a letter of credit.... While a letter of credit transaction consists of three or more parties and three or more independent legal relationships, a mere letter of credit consists only of two parties—the issuer and the beneficiary—and one legal relationship." *In re Taggatz*, 106 B.R. 983, 987 n. 1 (Bankr.W.D.Wis.1989). Unlike the normal letter of credit transaction, in our case there was no underlying contract for goods or services between the beneficiary (First Union) and the customers (Plaintiffs); the contract for goods or services was between First Union and CCG. In addition, a fourth legal relationship existed between CCG and Plaintiffs pursuant to which Plaintiffs obligated themselves to purchase a letter of credit which could be drawn down in the event of CCG's default on its contract with First Union.

Wis.Stat. § 405.103 Official UCC Comment 3 indicates that "[t]he legal relations between the customer and the beneficiary turn on the underlying transaction between them...." Furthermore, Wis.Stat.

§ 405.109 Official UCC Comment 1 provides that "the customer by entering the underlying transaction has assumed the risks inherent in it.... The allocation of such risks between the parties to the underlying transaction is a proper subject for agreement between them...." Thus, the Official UCC Comments indicate that in the usual letter of credit transaction there exists an underlying transaction between the customer and the beneficiary, pursuant to which each party assumes risks inherent in the transaction. In our case, Plaintiffs and First Union did not contract with each other. Instead, each contracted with a third-party, CCG. The Letter of Credit in and of itself creates no legal relations between them.

This conclusion is reinforced by Wis.Stat. § 405.114 Official UCC Comment 1, which states that "The letter of credit is essentially a contract between the issuer and the beneficiary and is recognized by this Article as independent of the underlying contract between the customer and the beneficiary (See Section 5–109 and Comment thereto)." [2] If, as is stated in Wis.Stat. § 405.114 Official UCC Comment 1, a letter of credit is independent of any underlying contract between the customer and the beneficiary, then it must be independent as well of the transactions which the customer and beneficiary enter into with third-parties, even where, as here, each transacts with the same third-party. That Plaintiffs contracted with CCG to purchase a letter of credit naming First Union as beneficiary, and First Union contracted with CCG to provide financing to CCG, does not give rise to any legal relationship between Plaintiffs and First Union.

Furthermore, federal case law does not support Plaintiffs' position that they should

---

**2.** Characterization of a letter of credit as a contract is somewhat inaccurate:

[T]he resulting letter of credit is not itself a contract, and the issuer's obligation to honor drafts is not, strictly speaking, a contractual one to the beneficiary. The beneficiary does not enter into any agreement with the issuer. Indeed, prior to issuance of the letter of credit, issuer and beneficiary may be wholly un-

known to each other. Yet once the letter of credit is established, the issuer becomes *statutorily* obligated to honor drafts drawn by the beneficiary that comply with the terms of the credit.

James J. White and Robert S. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 18–2 at 711 (West, 2d ed 1980) (emphasis in original).

be entitled to assert a guarantor's defenses to payment.[3] The *Taggatz* court explained:

> A letter of credit is not a guaranty contract because the obligation of an issuer is primary and the obligation of an issuer arises upon presentment of documents in compliance with the letter of credit. The obligation of a guarantor is secondary and arises upon the principal debtor's default. A letter of credit is not a third party beneficiary contract because the claim of a beneficiary is not subject to the defenses the issuer might have against the customer on the contract for the letter of credit.

*In re Taggatz*, 106 B.R. at 987 n. 1, citing James J. White and Robert S. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 18–2 at 715 (West, 2d ed 1980). In *F.D.I.C. v. Freudenfeld*, 492 F.Supp. 763, 768 (E.D.Wis.1980), the court stated that "[a] standby letter of credit is simply not a guaranty even though it has some of the same characteristics."

In *Bank of North Carolina, N.A. v. Rock Island Bank*, 570 F.2d 202, 206 (7th Cir.1978), the Seventh Circuit Court of Appeals observed that "[a]s every letter of credit serves, in one sense or another, as a guaranty, it makes little sense to deny enforcement of a letter of credit as *ultra vires* simply because it serves a guaranty function." In a footnote to that sentence, the Court stated:

> Indeed, the essential distinction between the letter of credit and the contract of guaranty is purely formal, not functional. Like the contract of guaranty, the letter of credit may be so designed as to secure the performance of another contractual obligation. Not surprisingly, such credits are called "guaranty" letters of credit. Unlike the true contract of guaranty, however, the guar-

anty letter of credit will oblige its issuer to pay on the presentation of specified documents showing a default, rather than upon proof of the fact of default. The central distinction between the two instruments, thus, is that the letter of credit creates a primary liability on an original obligation—to pay on the presentation of documents—whereas the contract of guaranty creates a secondary liability on the pre-existing obligation of another—to pay in the event that the other does not.

> Accordingly, where a letter of credit has required payment upon the presentation of specified documents, it has consistently been held to create a valid obligation rather than an *ultra vires* guaranty, even though it functionally secured the contractual obligation of another. Where the purported letter of credit required its issuer to do more than deal in documents, however, it has been deemed an unlawful guaranty.

*Id.*, 570 F.2d at 206 n. 7 (citations omitted).[4] If we are to be guided by decided cases in this Circuit, the Letter of Credit, which required payment upon the presentation of documents, created a primary liability upon First Wisconsin. It did not function as a guaranty to create a secondary liability in the Plaintiffs as to the obligation of CCG to First Union.

In arguing for a contrary conclusion, Plaintiffs heavily rely on *Warner v. Central Trust Co.*, 798 F.2d 167 (6th Cir.1986), asserting that "[u]nder the analysis in *Warner*, plaintiffs should be characterized as guarantors (and/or sureties), with all attendant rights and defenses." However, *Warner* does not support this proposition. In that case, Warner, a limited partner, and the partnership signed an "equity loan assumption agreement" pursuant to which

---

3. "[T]he obligation of a guarantor depends on the existence of a primary obligation on the part of the guarantor's principal running to the principal's 'creditor'. Thus the guarantor can set up defenses the principal has against the 'creditor', but an issuer cannot ... generally set up defenses the customer has against the beneficiary." James J. White and Robert S. Summers, *Handbook of the Law Under the Uniform Commercial Code* § 18–2 at 713 (West, 2d ed 1980).

4. *See also Instituto Nacional de Commercializacion Agricola v. Continental Illinois National Bank and Trust Co.*, 858 F.2d 1264, 1269 (7th Cir.1988) ("All letters of credit are bottomed on the principle 'that the parties are *not* required to look beyond the face of the documents presented.'") (citation omitted; emphasis in original).

Warner agreed to assume the partnership's obligations on a non-recourse equity loan up to the amount of Warner's financed investment and to furnish a letter of credit in the amount of his financed investment. Warner asserted that upon its subsequent execution by the partnership and the creditor, the terms of the equity loan, (which incorporated his equity loan assumption agreement), had been changed without his consent. He argued that as a surety or guarantor of the partnership's obligation to the creditor on the equity loan, he was exonerated by the change in its terms to which he had not consented.

The Sixth Circuit Court of Appeals noted it was irrelevant that the collateral provided by Warner was a letter of credit as opposed to cash, a pledge of securities, or a secured interest in property, and determined that the district court had "erred in focusing on the letter to determine the nature of Warner's obligations." *Warner*, 798 F.2d at 170. It was contended, however, that Warner could not be a guarantor of the equity loan because, as a limited partner whose contribution was financed in part by the loan, "the debt was his own." Assuming the debt was Warner's own, Warner would be a principal. Warner himself had made no agreement with the creditor, but under this interpretation of the facts it was possible that the partnership had acted as Warner's agent to obtain the equity loan.

The Sixth Circuit indicated that it need not decide between the guarantor or agency arguments,

for whether Warner was a guarantor of the Partnership debt to Penn Square or whether Warner was the principal on the loan and the Partnership his agent, the outcome in this case is the same. A guarantor is exonerated from his obligation "if by any act of the creditor, without the consent of the guarantor, the original obligation of the principal is altered in any respect." Okla.Stat.Ann. tit. 15 § 338 (West 1966). Thus, the change in the terms of the Equity Loan from those set forth in the Equity Loan Assumption Agreement would exonerate

Warner as guarantor unless he knew or had reason to know of those changes and assented to them. Similarly, under general agency principles Warner would not be bound by the act of his agent in agreeing to the altered Equity Loan unless the agent—the Partnership—had actual or apparent authority to make such changes. *See* Restatement (Second) of Agency § 140 (1957).... Of course, an *ultra vires* act of an agent can still bind the principal if the latter assented to, or ratified, the unauthorized agreement. *Id.* §§ 143, 82, 94.

*Warner*, 798 F.2d at 170–71. The Court thus remanded the case for determination of whether Warner knew or had reason to know of alteration of the equity loan, and assented to those changes. *Id.* If it were determined that Warner had assented to the changes in the equity loan, then presumably he would be bound as a guarantor or principal. If he had not assented to the changes, then presumably he would either be released from the guaranty or held not obligated as a principal on the loan.

Clearly, *Warner* cannot be construed as standing for the proposition that account parties who procure letters of credit to secure the debts of others may be characterized as guarantors or sureties; the Sixth Circuit did not reach this issue. Furthermore, Plaintiffs interpret the Sixth Circuit's indifference as to the type of collateral provided to mean that it was the act of providing the letter which would have given rise to Warner's ability to assert a guarantor's rights and defenses. The Sixth Circuit made no implicit or explicit finding to that effect. It is equally, if not more, reasonable to infer that the Sixth Circuit was instead concerned with whether the terms of the equity loan assumption agreement, containing as it did a written assumption of indebtedness, created a guaranty. Plaintiffs have not alleged the existence of any written agreement with CCG or First Union in our case, be it an assumption agreement, guaranty, or surety contract, and no such oral agreement can be

implied.[5] Nor, as will be discussed, does a suretyship obligation arise in our case by operation of law.

Plaintiffs emphasize the functional similarities of letters of credit and guaranties. However, as has been stated:

A letter of credit always serves as a guaranty. This does not mean that it is a guaranty. A letter of credit is an identical twin to a guaranty, but the fact that the two things look alike and may be used for the same purpose and are difficult to distinguish one from the other, does not mean they are the same things, and does not mean there are not differences, which, however subtle, are of major importance.

Harfield, *Uniform Commercial Code Symposium: Code Treatment of Letters of Credit*, 48 Cornell L.Q. 92, 93 (1963). The same argument raised by the Plaintiffs was raised in *First Arlington National Bank v. Stathis*, 115 Ill.App.3d 403, 71 Ill.Dec. 145, 450 N.E.2d 833 (1983). There the court stated that "[t]he obvious flaw in plaintiff's position is that, if adopted, it would convert the letter of credit into a contract of guaranty or suretyship, for it destroys the sole distinguishing feature between them." *Id.*, 71 Ill.Dec. at 152, 450 N.E.2d at 840. There is little except potential mischief in accepting a functional equivalence argument. Types of security interests may be functionally equivalent, but the rights which flow from such interests are not identical. To hold otherwise would be to blur distinctions which have been given legal significance in codes and prior cases.

Plaintiffs liken their provision of the Letter of Credit in our case to a pledge of property, such as real estate. They then recite the general rule that "suretyship can arise by pledge of property rather than by personal guarantee, and provides the pledgor with the same rights, privileges and discharge defenses as does personal suretyship." Plaintiffs conclude that they were sureties on the Consolidated Obligations by virtue of purchasing the Letter of Credit as additional security for CCG's liability on the Note, which later was made a part of the Consolidated Obligations. They state: "[U]sing the real property analogy, if such property were titled in the name of a third party and assigned directly to First Union as collateral for the CCG's debt, the third party clearly was acting as surety on the debt."

Plaintiffs' argument fails for at least two reasons. Initially, real estate transactions may be distinguished from letter of credit transactions, as the owner remains a pledgor/mortgagor, and the real estate must be foreclosed in a forum where equity requires that defenses of the owner be considered. The legal rights arising from the delivery of a letter of credit, as previously discussed in detail, are more circumscribed—that being the principal attraction for the use of letters of credit. Secondly, "[w]hile the form of a suretyship obligation is not material, such obligation will not be implied, and never arises by act of the parties except by express contract or by operation of law." 74 Am.Jur.2d *Suretyship* § 7 (1974) (footnotes omitted). Plaintiffs are not bound on the principal debt, the Consolidated Obligations between CCG

---

**5.** Wis.Stat. § 241.02(1)(b) (1986) provides:
  (1) In the following case every agreement shall be void unless such agreement or some note or memorandum thereof, expressing the consideration, be in writing and subscribed by the party charged therewith:
  (b) Every special promise to answer for the debt, default or miscarriage of another person.
Thus, "[a] special promise to answer for the debts of a third party is void unless in writing and subscribed by the person to be charged." *U.S. Oil Co., Inc. v. Midwest Auto Care Services, Inc.*, 150 Wis.2d 80, 90, 440 N.W.2d 825 (App. 1989). Furthermore,

[t]here cannot be an express and an implied contract for the same thing existing at the same time. It is only when parties do not expressly agree that the law interposes and raises a promise. No agreement can be implied where there is an express one existing. Thus, an express contract precludes the existence of a contract implied by law or a quasi-contract.

66 Am.Jur.2d *Restitution and Implied Contracts* § 6 (1973) (footnotes omitted). As First Union notes, "[t]he terms and legal effect of the Letter of Credit preclude a guaranty by implication."

and First Union, and thus cannot be considered sureties either under express contract or by operation of law:

> Although the relation of principal and surety generally springs from some agreement by which one person becomes personally bound for the debt of another, it may likewise grow out of a transaction whereby a person's property becomes security for payment of a debt or the performance of an act by another. In some states there are statutory provisions to this effect. Thus, a suretyship relation may be effected by a mortgage, or a pledge of property to secure another's obligation. As such surety, the mortgagor or pledgeor is entitled to all the rights and privileges of a personal surety, and will be discharged by anything that would discharge a surety who is personally bound. *On the other hand, it has been held that the parties to an instrument given as collateral security for the payment of a debt due by others are not subject to the law which governs sureties, since they are not bound for the principal debt, and their engagement is independent of it.*

74 Am.Jur.2d *Suretyship* § 12 (1974) (footnotes omitted; emphasis supplied). As First Union has noted, "[i]f the Letter of Credit had expired without draw, First Union would have had no right to pursue Plaintiffs on any guaranty agreement." Plaintiffs, as purchasers of the Letter of Credit given as collateral security for the payment of the Note due by CCG, are not subject to the law of suretyship, since they are not liable on the Note, (nor upon the Consolidated Obligations of which the Note has become a part), and their engagement is independent of it.

■ Plaintiffs argue that in the event that they are not entitled to assert the defenses of a guarantor, they are yet entitled to be subrogated to First Union's rights in relation to CCG. "Subrogation entitles the party paying the debt to exercise all rights and remedies, which the creditor possessed against the party who should have paid the debt." *In re Russell,* 101 B.R. 62, 64 (Bankr.W.D.Ark.1989), *citing American Surety Co. v. Bethlehem National Bank,* 314 U.S. 314, 317, 62 S.Ct. 226, 228, 86 L.Ed. 241 (1941). Both Plaintiffs and First Union cite *In re Kaiser Steel Corp.,* 89 B.R. 150, 152 (Bankr.D. Colo.1988), for the proposition that one must satisfy both the requirements of 11 U.S.C. § 509 and equitable principles of subrogation in order to be subrogated to the rights of a creditor.[6] *Kaiser Steel* must be contrasted with *In re Spirtos,* 103 B.R. 240, 245 (Bankr.C.D.Cal.1989), stating that "the doctrine of equitable subrogation is separate and distinct from the subrogation rights afforded by section 509, and that section 509 is an additional, but not exclusive, remedy in bankruptcy," and with *In re Cooper,* 83 B.R. 544, 546 (Bankr.C.D. Ill.1988), stating that "[t]he right of a codebtor to subrogate under the Code is a federally created right. This right neither refers to nor is based on state law. Therefore, in this analysis state law is irrelevant." Because the Plaintiffs are not entitled to be subrogated to First Union's rights against CCG under either Section 509 or "legal subrogation,"[7] I need not decide whether these two remedies are independent or interdependent of one another, or whether there even exists a right to assert legal subrogation in bankruptcy.

11 U.S.C. § 509 provides:

(a) Except as provided in subsection (b) or (c) of this section, an entity that is liable with the debtor on, or that has secured, a claim of a creditor against the debtor, and that pays such claim, is subrogated to the rights of such creditor to the extent of such payment.

(b) Such entity is not subrogated to the rights of such creditor to the extent that—

> (1) a claim of such entity for reimbursement or contribution on account

---

**6.** *See generally* Pappas, *Reconciling Standby Letters of Credit and the Principles of Subrogation in Section 509,* 7 Bankr.Dev.J. 227 (1990).

**7.** " 'Legal' subrogation is an equitable right which arises by operation of law and not by

contract." *American National Bank & Trust Co. of Chicago v. Weyerhaeuser Co.,* 692 F.2d 455, 460 (7th Cir.1982) (citations omitted).

of such payment of such creditor's claim is—

    (A) allowed under section 502 of this title;

    (B) disallowed other than under section 502(e) of this title; or

    (C) subordinated under section 510 of this title; or

(2) as between the debtor and such entity, such entity received the consideration for the claim held by such creditor.

(c) The court shall subordinate to the claim of a creditor and for the benefit of such creditor an allowed claim, by way of subrogation under this section, or for reimbursement or contribution, of an entity that is liable with the debtor on, or that has secured, such creditor's claim, until such creditor's claim is paid in full, either through payments under this title or otherwise.

Clearly, unlike CCG, Plaintiffs were not "liable on" the Consolidated Obligations. Plaintiffs assert, however, that they "secured" First Union's claim against CCG within the meaning of Section 509. Even assuming that by providing the Letter of Credit to First Union, Plaintiffs may be said to have "secured" First Union's claim against CCG on the Consolidated Obligations, Plaintiffs may only be subrogated to First Union if it may also be said that Plaintiffs "paid such claim" per the requirements of Section 509(a). First Wisconsin was obligated to pay First Union in the event the Letter of Credit was drawn upon; the Letter was drawn down, and First Wisconsin paid the amount due under the Letter. Its payment on the Letter of Credit fulfilled First Wisconsin's obligations under the Letter as well as under its contract with Plaintiffs. Because the payment had the effect of paying down a proportionate part of First Union's claim on the Consolidated Obligations, and because Plaintiffs are obligated to reimburse First Wisconsin under Wis.Stat. § 405.114(3) (1963), Plaintiffs appear to argue that they may be said to have paid on the claim. They thus argue that the requirements for subrogation under Section 509(a) have been met.

Plaintiffs' argument ignores the independent nature of the contract between an issuer (First Wisconsin) and a beneficiary (First Union). *See* Wis.Stat. § 405.114 Official UCC Comment 1. It has already been determined that Plaintiffs are not guarantors or sureties of the Consolidated Obligations. In agreeing to purchase a Letter of Credit which would be issued to First Union and could be drawn down in the event of CCG's default or failure to timely provide a replacement letter of credit, Plaintiffs undertook an obligation independent of First Wisconsin's obligation as an issuer to make payment when the Letter of Credit was drawn upon. Regardless of the effect of the payment by First Wisconsin to First Union, the fact remains that neither First Wisconsin nor Plaintiffs paid First Union's claim against CCG on the Consolidated Obligations; each merely performed its own independent contractual and/or statutory duties. Because Plaintiffs did not pay the claim, they may not be subrogated under Section 509(a).

Plaintiffs cite *In re Minnesota Kicks, Inc.,* 48 B.R. 93 (Bankr.D.Minn.1985) and *In re Sensor Systems, Inc.,* 79 B.R. 623 (Bankr.E.D.Pa.1987) in support of their contention that they are entitled to be subrogated to First Union. In *Minnesota Kicks,* the court determined that a letter of credit account party who had reimbursed an issuing bank for its payment on the letter could be subrogated to the rights of the beneficiary who had drawn down the letter, and in *Sensor Systems* the court determined that an issuer who made payment on a letter of credit could be subrogated to the rights of a beneficiary who had drawn down the letter. *Minnesota Kicks,* 48 B.R. at 105; *Sensor Systems,* 79 B.R. at 624.

In both *Minnesota Kicks* and *Sensor Systems,* the courts equated the issuer's rights with those of a guarantor, the *Minnesota Kicks* court stating:

While a letter of credit may require conformity with certain obligations and formalities which are not required of a

guarantee, where there is no contrary policy reason for treating them dissimilarly for other purposes, precluding the assertion of subrogation rights to issuers of standby letters of credit while allowing guarantors to assert them would be no more than an exercise in honoring form over substance.

Subrogation entitles the surety or guarantor to use any remedy against the principal which the creditor could use and in general to enjoy the benefit of any advantage that the creditor had. I think it is clear that the surety or guarantor can assert a claim against the estate of the debtor for debts it was required to pay. Therefore I think the issuer of a letter of credit can also assert the claim of creditors paid with proceeds of the letter of credit.

*Minnesota Kicks*, 48 B.R. at 104–05 (citations omitted); *Sensor Systems*, 79 B.R. at 626 ("We further believe that a party issuing a letter of credit in favor of another is logically characterized as a 'guarantor' or a 'codebtor.'" (citation omitted)).

In *Minnesota Kicks* the court further determined that the account party who had reimbursed the issuer for a draw upon the letter of credit could assert the issuer's rights upon subrogation to the beneficiary:

> [f]or the reasons similar to those discussed with regard to subrogation of Swiss Bank Corporation as issuer, where Oberberg [the account party] paid Swiss Bank Corporation for the debtor's debts pursuant to the contract between Swiss Bank and Oberberg, Oberberg should acquire whatever rights Swiss Bank acquired when it paid the debtor's creditors. Therefore to the extent Marquette National Bank and NASL [beneficiaries] could assert claims against the debtor, I believe Oberberg may now assert them.

*Minnesota Kicks*, 48 B.R. at 105 (footnote omitted). Thus, in *Minnesota Kicks*, the determination that an account party possesses the rights of a guarantor who is entitled to subrogation was based upon the determination that the issuer possessed such rights.

It has already been established that Plaintiffs, in their own behalf, are not entitled to assert the rights of sureties or guarantors. The holding in *Minnesota Kicks* that an account party is entitled to be subrogated to a beneficiary is derived from the invalid premise that an issuer possesses subrogation rights as a consequence of its status as a guarantor. An issuer is not a guarantor, nor has the issuer any independent right to subrogation.

As has been stated, "[a] letter of credit is not a guaranty contract because the obligation of an issuer is primary and the obligation of an issuer arises upon presentment of documents in compliance with the letter of credit. The obligation of a guarantor is secondary and arises upon the principal debtor's default." *In re Taggatz*, 106 B.R. at 987 n. 1 (citation omitted). First Wisconsin, as issuer, was the primary obligor on the Letter of Credit; its duty to pay was absolute upon presentation of a conforming sight draft. In making payment, First Wisconsin paid its own debt, not that of another, and thus does not qualify as a guarantor: "The simple fact is that when the Bank [the issuer] paid its *own* debt it cannot then step into the shoes of the party it paid to pursue that party's rights against a third party, absent an agreement of all the parties." *Kaiser*, 89 B.R. at 154 (emphasis in original); *accord, Matter of Munzenrieder Corp.*, 58 B.R. 228, 231 (Bankr. M.D.Fla.1986) ("It is clear that subrogation is not available to one who simply pays his own debt, as the Bank did in this case.") (citation omitted).

Moreover, First Wisconsin is neither liable with CCG on, nor has it secured, the claim of First Union against CCG on the Consolidated Obligations, nor has it paid that claim. Assuming Plaintiffs' rights as an account party are derivative of First Wisconsin's rights as an issuer, it is clear that where First Wisconsin possesses no right of legal subrogation nor any under Section 509, Plaintiffs cannot derive subrogation rights from First Wisconsin.

Plaintiffs do not possess the right to legal subrogation in their own behalf. "Subrogation puts one to whom a right

does not belong in the position of the owner of that right. The extent of the new right created in favor of the subrogee is measured by the original right in the subrogor." *Waukesha County v. Johnson,* 107 Wis.2d 155, 160, 320 N.W.2d 1 (App. 1982), *citing Garrity v. Rural Mutual Ins. Co.,* 77 Wis.2d 537, 541, 253 N.W.2d 512 (1977). Under Wisconsin cases,[8] subrogation "may properly be applied whenever a person other than a mere volunteer pays a debt which in equity and good conscience should be satisfied by another." *Rock River Lumber Corp. v. Universal Mortgage Corp. of Wisconsin,* 82 Wis.2d 235, 240–42, 262 N.W.2d 114 (1978) (citations omitted).

"Subrogation is an equitable doctrine which prevents unjust enrichment, and one seeking subrogation must have superior equity." *Horace Mann Ins. Co. v. Wauwatosa Board of Education,* 88 Wis.2d 385, 394, 276 N.W.2d 761 (1979) (citation omitted); *accord, First National Bank of Columbus v. Hansen,* 84 Wis.2d 422, 429, 267 N.W.2d 367 (1978) ("Subrogation is based on equity and is permitted only when the rights of those seeking subrogation have greater equity than the rights of those who oppose it.") (citations omitted). Accordingly, "it is necessary to consider whether the rights of any third party have intervened in such a way as to render it inequitable to grant subrogation." *Rock River Lumber,* 82 Wis.2d at 245, 262 N.W.2d 114 (citation omitted). Furthermore, "subrogation will not be permitted where it works a result that is contrary to public policy." *Hansen,* 84 Wis.2d at 429, 267 N.W.2d 367 (citation omitted).

Plaintiffs contracted with First Wisconsin to purchase the Letter of Credit in order to fulfill their obligation under the agreement with CCG. They cannot be characterized as volunteers (presumably they received some consideration in return for making the agreement, and thus were

not donees either). However, it cannot be said that Plaintiffs paid a debt "which in equity and good conscience should be satisfied by another." Plaintiffs either paid, or are obligated to pay, their own debt by reimbursing First Wisconsin for the draw on the Letter of Credit. To allow a right to subrogation where one simply discharges one's own debt would be inequitable, and could result in that person's unjust enrichment—the very situation which subrogation seeks to remedy.

Plaintiffs do not argue that First Union will be unjustly enriched if Plaintiffs are denied the right to be subrogated to First Union, nor could they tenably do so. The Letter of Credit fulfilled its purpose by upgrading the credit of CCG. Although the Letter of Credit was drawn upon by First Union, First Union will not realize on any more security than is necessary to satisfy its claim against CCG on the Consolidated Obligations, and the excess security, if any, will become unencumbered assets of CCG's bankruptcy estate, available for distribution to unsecured creditors.

Plaintiffs, in addition to the consideration presumably received by them under their agreement with CCG, could have negotiated for additional security, or sought an agreement with CCG and First Union pursuant to which, in the event the Letter of Credit was drawn upon, they would be assigned, subordinate to satisfaction of First Union's claim, First Union's security interests in CCG. They apparently failed to do so. The *Munzenrieder* court stated the following with respect to an issuer's contention for subrogation:

> The letter of credit was issued by the Bank only upon the payment of a hefty premium in addition to security granted by Lee Wah Cane, which at the time appeared to be safe and adequate. The fact that it turned out to be different is

---

**8.** As Plaintiffs have noted, "common law principles of subrogation are essentially the same under both Wisconsin and North Carolina law." "The similarity between the law in the two states moots any choice-of-law issue which might otherwise exist by virtue of the fact that the CCG Loan Agreement with First Union states that North Carolina law applies while the Letter-of-Credit and Security Agreement with plaintiffs provides that Wisconsin law applies." First Union has not contested these conclusions. As the parties apparently have no preference as to choice of law, this court will apply Wisconsin law which addresses equitable principles of subrogation.

without legal significance and means nothing more or less than that the Bank entered into a transaction which might have appeared to be sound and profitable but which turned out to be a total loss, a fact legally meaningless and insufficient to invoke the doctrine of equitable subrogation.

*Munzenrieder*, 58 B.R. at 231. Although Plaintiffs are account parties and not issuers, the fact that they made a bad bargain with CCG is similarly without legal significance and insufficient to invoke the doctrine of equitable subrogation.

Plaintiffs' equitable rights to be subrogated to First Union's rights in excess security, if any, do not exceed the intervening rights of CCG's unsecured creditors which have arisen as a consequence of CCG's bankruptcy. If Plaintiffs injudiciously entered an agreement with CCG under which they took inadequate security, CCG's unsecured creditors should not be prejudiced by having the pool of assets from which they may recover diminished by allowing Plaintiffs the right of subrogation. The granting of subrogation under such circumstances would be clearly inequitable. To the extent that the security presumably taken by Plaintiffs under their contract with CCG is insufficient to satisfy CCG's obligations under the contract, Plaintiffs, like the other unsecured creditors, will have an unsecured claim in CCG's bankruptcy. They will accordingly, and equitably, share *pro rata* with other unsecured creditors in any dividend to unsecured claims. For all these reasons, Plaintiffs are not entitled to legal subrogation.

As a matter of law, neither the relationship between Plaintiffs and CCG nor that between First Union and CCG affects the Plaintiffs' rights vis-a-vis First Union.

Plaintiffs, by entering their agreement with CCG, assumed the risks inherent in that agreement. If Plaintiffs have an action, it is a direct action against CCG and not an indirect action against First Union.[9] As has been established, Plaintiffs are not guarantors and they are not entitled to be subrogated to First Union. Plaintiffs have alleged no set of facts which, if proved, would entitle them to relief from First Union.[10] Accordingly, First Union's motion to dismiss for failure to state a claim must be granted.

---

9. "The adversely affected party [in a letter of credit arrangement] may or may not be entitled to a remedy, that is, the breakdown may be one for which he bears the risk. When he does have a remedy, it may take the form of damages, an injunction, a defense, etc. Also, when he has a remedy, that remedy may not be premised on a letter of credit theory as such. It may be premised in contract or even in tort." James J. White and Robert S. Summers, *Handbook of the Law Under the Uniform Commercial Code*

§ 18–5 at 727 (West, 2d ed 1980). *See also Instituto Nacional v. Continental Illinois National Bank,* 858 F.2d at 1269.

10. *See Ellsworth v. City of Racine,* 774 F.2d 182, 184 (7th Cir.1985), *cert. denied,* 475 U.S. 1047, 106 S.Ct. 1265, 89 L.Ed.2d 574 (1986), *citing, Benson v. Cady,* 761 F.2d 335, 338 (7th Cir.1985), *quoting, Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).